### In re FLAT GLASS ANTITRUST LITIGATION.

#### Nos. 97–550, MDL 1200.

United States District Court, W.D. Pennsylvania, Pittsburgh·Division.

Nov. 5, 1999.

*OPINION*

ZIEGLER, Chief Judge.

Pending before the court is plaintiffs' motion (doc. no. 109) for class certification pursuant to Rule 23(a), (b)(3) and (c)(4)(B) of the Federal Rules of Civil Procedure. Plaintiffs commenced this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging a horizontal price-fixing conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs seek certification of two subclasses:

*The Flat Glass Products Subclass:* all individuals and entities who, during the period from August 1, 1991 through December 31, 1995, purchased flat glass products in the United States directly from one or more of the defendants or their controlled subsidiaries, but excluding defendants, their parents, subsidiaries and affiliates and governmental entities.[1]

*The ARG Subclass:* all individuals and entities who, during the period from August 1, 1991 through December 31, 1995, purchased ARG for domestic makes of cars in the United States directly from one or more of the defendants or their controlled subsidiaries, but excluding defendants, their parents, subsidiaries and affiliates, governmental entities, automobile manufacturers and purchasers of ARG products from defendants or their controlled subsidiaries at the installation level.

Pls.' Mot. Class Certification at 1.

Plaintiffs contend that, from August 1, 1991 through December 31, 1995, defendants conspired to fix, raise and maintain the price of flat glass and all flat glass products sold in the United States in violation of the Sherman Act.[2] Further, plaintiffs allege that, as a result of the conspiracy, members of the two proposed subclasses paid higher prices than they would have paid absent the conspiracy. Defendants, Pilkington PLC and Pilkington Libbey–Owens–Ford Co, Inc. ("Pilkington"),[3] PPG Industries, Inc. ("PPG"), Ford Motor Co. ("Ford"), Guardian Industries ("Guardian"),[4] and AFG Industries, Inc. ("AFG")[5] contend that plaintiffs' motion for class certification should be denied because the proposed subclasses fail to satisfy the requirements of Rule 23(a) and (b)(3). For the reasons that follow, we will grant plaintiffs' motion for class certification.

## I. The Flat Glass Industry

The flat glass[6] industry in the United States is a multi-billion dollar industry, consisting of five primary producers, namely, Pilkington, PPG, Ford, Guardian and AFG. Through the float process,[7] defendants pro-

---

1. For purposes of this subclass definition, the term "flat glass products" includes all primary flat glass (glass produced at the float plant) and all products subsequently fabricated therefrom, excluding: (1) fabricated automotive glass sold to automobile original equipment ("OE") manufacturers; (2) fabricated automotive replacement glass ("ARG") for both domestic and foreign makes of vehicles; (3) defendant LOF's TEC series of products: TEC 8/10, TEC 20, TEC 70, TEC 300, TEC 1000, OPTEC, and Mirro–TEC. Pls.' Mot. Class Certification at 1.

2. Section 1 of the Sherman Act provides:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal[.]
 15 U.S.C. § 1 (1997).

3. On or about June 29, 1999, Pilkington withdrew its opposition to plaintiffs' motion for class certification. *See* Doc. No. 175.

4. On or about August 17, 1999, Guardian withdrew its opposition to plaintiffs' motion for class certification. *See* Doc. No. 194.

5. On or about July 27, 1999, AFG withdrew its opposition to plaintiffs' motion for class certification. *See* Doc. No. 189.

6. Flat glass "includes all unfabricated and fabricated glass products manufactured through the 'float process,' whether transparent, opaque, translucent, reinforced or otherwise, formed in a flat shape, such as for cutting into window panes, or glass formed flat and subsequently bent or curved, such as for fabrication into automobile windshields." Consolidated and Am. Class Action Compl. ¶ 5(b).

7. The "float process" is:
 the process of manufacturing flat glass by passing molten glass from a melting furnace to a bath in which a continuous ribbon of molten

duce approximately ninety-seven percent of all unfabricated glass and fabricated glass in the United States. Consolidated and Am. Class Action Compl. at ¶ 53. Upon production of flat glass, defendants (either directly or through parents, subsidiaries or affiliates) sell the product as such or manufacture various fabricated glass products, including products used for automotive and architectural uses. *Id.* at ¶ 56. According to plaintiffs, defendants dominate the fabricated flat glass market, and fabricated glass accounts for approximately two-thirds of defendants' total dollar sales and a majority of their profits. *Id.* at ¶ 54.

The principal uses for fabricated flat glass are architectural (consisting primarily of glass windows and doors used in construction of residential and commercial structures) and automotive (consisting primarily of glass used for windshields, side and rear windows for original equipment and replacement windshields). *Id.* at ¶ 55. "Other trade," such as, *inter alia,* mirrors, doors, appliances and furniture, provides a third end-use category for non-automotive fabricated glass.

According to plaintiffs, during the late 1980s and early 1990s, defendants began experiencing a "downward spiral" in prices. To remedy this problem, defendants allegedly conspired to fix, maintain and stabilize prices for flat glass and all flat glass products and issued price increase announcements in furtherance of the conspiracy. Plaintiffs contend that, because of the alleged price-fixing conspiracy, price competition was nonexistent, and that all class members paid more than they would have paid absent the alleged conspiracy.

## II. Requirements for Class Certification

■ A district court has discretion to grant or deny class certification. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982),

*cert. denied sub nom. Alaska v. Boise Cascade,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983). However, the "interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg,* 766 F.2d at 785 (citations and quotations omitted). With these standards in mind, we shall determine whether plaintiffs have met the requirements for class certification.

### A. Standard For Class Certification

■ A party seeking class certification must prove that the action satisfies the requirements for a class action. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (listing class certification requirements). Rule 23(a) and (b)(3) provide:

(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) An action may be maintained as a class action if the prerequisites of (a) are satisfied, and in addition: (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any

glass floats on a liquid of greater density than the glass, normally composed of molten tin, where it is polished under controlled temperatures and subsequently fed into an annealing oven, where it is gradually cooled. The float process has replaced all other methods of producing flat glass in the United States, due to its

ability to produce flat glass of uniform thickness with an absence of distortions. The float process also reduces fuel consumption and labor costs relative to other glass production methods.

Consolidated and Am. Class Action Compl. ¶ 5(a).

litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED.R.CIV.P. 23(a)–(b).

Rule 23(c)(4)(B) provides: "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Thus, to obtain class certification, plaintiffs must prove numerosity, commonality, typicality, adequate representation, predominance and superiority with respect to the two classes sought to be certified.[8] *See Amchem*, 521 U.S. at 613–14, 117 S.Ct. 2231.

### 1. Rule 23(a) Class Certification Requirements

#### a. Numerosity

■ Rule 23(a)(1) requires that the class must be so numerous that joinder of all members is impracticable. *See Amchem*, 521 U.S. at 613, 117 S.Ct. 2231 (numerosity satisfied upon showing a class so large that joinder of all members is impracticable); *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 309 (3d Cir.1998) (same), *cert. denied sub nom. Krell v. Prudential Ins. Co. of Am.*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). Impracticable does not mean impossible, i.e., a plaintiff need not show that joinder cannot be accomplished. *See In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 149 (E.D.Pa. 1979), *aff'd*, 685 F.2d 810 (3d Cir.1982), *cert. denied sub nom. Alaska v. Boise Cascade*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983). *See also* 4 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18.03, at 18–11 (3d ed.1992). Instead, showing a strong litigational hardship or inconvenience may be sufficient. *See In re Fine Paper*, 82 F.R.D. at 149.

■ Plaintiffs contend, without rejoinder from defendants, that "there are at least hundreds, if not thousands, of persons and entities included within both the [Flat] Glass Products Subclass and the ARG Subclass."[9] Pls.' Mem. at 8. Classes consisting of hundreds (and potentially thousands) of putative plaintiffs have routinely satisfied the numerosity requirement. *See, e.g., Eisenberg*, 766 F.2d at 785–86 ("allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement" of Rule 23); *Hedges Enters., Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 465 (E.D.Pa.1979) (numerosity requirement satisfied by allegation that proposed class numbered in the thousands).

Further, the evidence of record reveals that the putative plaintiffs reside in, *inter alia*, Arkansas, California, Florida, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, Ohio, Pennsylvania, Washington, West Virginia and Wisconsin. *See* Consolidated and Am. Class Action Compl. at ¶¶ 6–35. Joinder of this number of geographically dispersed entities would be impracticable because some members would be unable to assume the financial burdens associated with litigating individual antitrust lawsuits, and because some members have relatively small claims, rendering it unlikely and unfeasible, in an economic sense, for them to bring individual claims. *Accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 167–68, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Swanson v. American Consumer Indus.*, 415 F.2d 1326 (7th Cir.1969); *In re Fine Paper*, 82 F.R.D. at 149–50. Also, the significant geographic distribution among the class members makes joinder impracticable. *See In re Fine Paper*, 82 F.R.D. at 150; *accord* 1 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 3.05, at 3–23 to 3–24 (3d ed.1992) (where class numbers in the hundreds, thousands or larger, the impracticability of bringing all class members before the court is obvious, and the Rule 23(a)(1) nu-

---

8. To the extent possible, we shall combine our class certification analysis with respect to the proposed subclasses.

9. Although defendants contend that "[a] proposed class of purchasers of auto float would not satisfy the threshold numerosity requirement[,]"

Defs.' Mem. at 25–26, plaintiffs do not seek certification of such a narrow class. Instead, plaintiffs have sought certification of two larger subclasses which satisfy the numerosity requirement of Rule 23(a)(1).

merosity requirement is easily met). Plaintiffs' proposed subclasses satisfy the numerosity requirement of Rule 23(a)(1).

### b. Commonality [10]

■ Rule 23(a)(2) requires that there exist a "question[ ] of law or fact common to the class[.]" [11] Plaintiffs, however, are not required to show that all questions of law and fact are common. *See In re Chambers Dev. Sec. Litig.*, 912 F.Supp. 822, 834 (W.D.Pa. 1995); *In re Mellon Bank Shareholder Litig.*, 120 F.R.D. 35, 37 (W.D.Pa.1988). Furthermore, it is not necessary at this point of the determination that such common questions be shown to "predominate" over questions affecting only individual class members. *See Hedges Enters.*, 81 F.R.D. at 465 ("the requirements of Rule 23(a)(2) must be distinguished from the requirements of Rule 23(b)(3)"); *see also Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 627 (3d Cir.1996) (discussing the "low threshold for commonality"), *aff'd*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ The Court of Appeals has indicated that the "commonality requirement will be satisfied if the named plaintiffs **share at least one question of fact or law** with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994) (emphasis added); *see also In re The Prudential*, 148 F.3d at 310; *In re Agent Orange Prod. Liab.*, 818 F.2d 145, 166–67 (2d Cir. 1987), *cert. denied sub nom. Pinkney v. Dow Chem. Co.*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); *Weiss v. York Hosp.*, 745 F.2d 786, 808–09 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Thus, "[b]ecause the requirement may be satisfied by a single common issue, it is easily met[.]" *Baby Neal*, 43 F.3d at 56; *see also In re The Prudential*, 148 F.3d at 310 ("A finding of commonality does not require that all class members share identical claims," rather commonality is satisfied if the named plaintiff shares one question of law or fact with the

(putative class members) (quotations and citations omitted)).

■ Defendants argue that plaintiffs have failed to satisfy the commonality requirement because the proposed flat glass subclasses involve diverse products, markets, sellers, customers, different supply and demand and different pricing. Plaintiffs rejoin that the existence of the alleged conspiracy and its success satisfy the commonality requirement for both subclasses. We agree.

Courts interpreting the commonality requirement in the antitrust area have held that "allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement." 4 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18.05, at 18–15 (3d ed.1992). *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977) ("district court was correct in concluding that this question [existence of a conspiracy] is one common to the class"), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *In re Fine Paper*, 82 F.R.D. at 150 (finding common questions existed because "[e]ach plaintiff will be required to establish the existence of a conspiracy to fix, raise, maintain and stabilize the price of fine paper"); *Hedges Enters.*, 81 F.R.D. at 465 (Commonality requirement of class action rule was satisfied in price-fixing suit against paper bag manufacturers by fact that each member of class would be required to prove that defendants conspired to raise, fix, maintain and stabilize prices and terms and conditions of sale of consumer bags). Moreover, an allegation of a conspiracy is often viewed as a central or single overriding issue or a common nucleus of operative fact and will establish a common question. *See* 4 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18.05, at 18–15 to 18–21 (3d ed.1992).

Indeed, with respect to both subclasses, plaintiffs will be required to establish the existence of a conspiracy to fix the price of

---

**10.** Commonality, like numerosity, evaluates the sufficiency of the class itself. *See Hassine v. Jeffes*, 846 F.2d 169, 176 n. 4 (3d Cir.1988).

**11.** The Court of Appeals has noted that "[t]he concepts of commonality and typicality are broadly defined and tend to merge." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994).

flat glass products and ARG, and one which, if not established, will dispose of the entire litigation. *See, e.g., In re Fine Paper,* 82 F.R.D. at 150; *In re Corrugated Container Antitrust Litig.,* 80 F.R.D. 244, 247 (S.D.Tex. 1978); *In re Master Key Antitrust Litig.,* 70 F.R.D. 23, 26 (D.Conn.1975), *appeal dismissed,* 528 F.2d 5 (2d Cir.1975). Given plaintiffs' allegation of a § 1 conspiracy, the existence, scope and efficacy of the alleged conspiracy are certainly questions that are common to all class members. *Accord In re Fine Paper,* 82 F.R.D. at 150.

Further, although not dispositive, the Judicial Panel on Multidistrict Litigation noted in its transfer order that "[o]n the basis of the papers filed and the hearing held, the Panel finds that **the actions in this litigation involve common questions of fact** concerning allegations that the defendant manufacturers [12] of flat glass conspired to fix prices and allocate business for flat glass in violation of a federal antitrust statute." *See* Doc. No. 1 at 2 (emphasis added). Plaintiffs' proposed subclasses satisfy Rule 23(a)(2)'s commonality requirement.[13]

#### c. Typicality

 Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the class. Distinguished from the commonality requirement of subsection (a)(2) and the adequacy requirement of subsection (a)(4), typicality focuses on whether the individual claim of the class representatives has the essential characteristics common to the claims of the class. *See, e.g., Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988); *Eisenberg,* 766 F.2d at 786 ("The typicality requirement ... is something of an enigma in the jurisprudence of class actions." To a large extent, it overlaps the adequacy of representation and commonality requirements, as well as the predominance of common questions and superior means of resolution tests) (citations omitted). Or, stated differently, a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and, her or his claims are based on the same legal theory." 4 Herbert Newberg & Alba Conte, Newberg on Class Actions § 18.08, at 18–26 (3d ed.1992); *In re The Prudential,* 148 F.3d at 311. Typicality, however, does not mean identical. *See In re The Prudential,* 148 F.3d at 311; *Eisenberg,* 766 F.2d at 786.

 Defendants contend that:

Plaintiffs cannot prove typicality ... [because] the products and customers encompassed by the flat glass products subclass are too many and too fundamentally distinct to be swept into a single 'class.' The considerable differences in the markets in which each plaintiff participates and the products they buy, fabricate, install, or sell demonstrate that the plaintiffs cannot present evidence uniformly applicable to all putative class members.

Defs.' Mem. at 24. Further, defendants argue, because plaintiffs are in diverse markets, they have no interest in proving complicated pass-through claims that other class members will be required to prove. Thus, "the interests of plaintiffs in particular markets simply do not align with those of absent class members in diverse markets."[14] *Id.*

---

12. "PPG, Pilkington PLC, Libbey–Owens–Ford Co., AFG Industries, Inc., and Guardian Industries Corp. are named as defendant in all actions. In addition, Asahi Glass Co. is named as an additional defendant in one Minnesota action and Ford Motor Co. is named as an additional defendant in one Western Pennsylvania action." *See* Doc. No. 1 at 2.

13. We realize that there is potential for individual questions to arise. However, the Court of Appeals has indicated that "[e]ven where individual facts and circumstances do become important to the resolution, class treatment is not precluded. Classes can be certified for certain particularized issues, and, under well-established principles of modern case management, actions are frequently bifurcated." *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994).

14. Defendants also assert that the typicality requirement is lacking because, during the class period, Cardinal was both a manufacturer and purchaser of non-auto float. Defs.' Mem. at 36. Further, defendants note that Cardinal's prices for glass decreased during the class period, and Cardinal has released all claims against AFG. Notwithstanding defendants' arguments, we find these facts insufficient to preclude class certification given the overwhelmingly common issues involved. As discussed *infra,* Cardinal purchased flat glass from the other defendants; therefore, common issues exist vis-a-vis Cardinal and the remaining defendants. Moreover, issues

Plaintiffs rejoin that "[t]he claims of the proposed class representatives arise from the same events or course of conduct and assert no claims peculiar to themselves, and are based on the same legal theory as the claims of the other subclass members." Pls.' Mem. at 10. We agree.

Plaintiffs' primary claim is that they were injured in their trade or business by a conspiracy among defendants to fix the price of flat glass and all flat glass products; therefore, we find that plaintiffs' claims are typical of those of the members of the proposed subclasses. See Hedges Enters., 81 F.R.D. at 465 (citing Axelrod v. Saks & Co., 77 F.R.D. 441, 444 (E.D.Pa.1978)). "Since the representative parties need prove a conspiracy, its effectuation, and damages therefrom precisely what the absentees must prove to recover the representative claims can hardly be considered atypical." In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322, 336 (E.D.Pa. 1976) (quoting State of Minnesota v. United States Steel Corp., 44 F.R.D. 559, 567 (D.Minn.1968)).

Indeed, the named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants. The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong. See In re The Prudential, 148 F.3d at 312; Baby Neal, 43 F.3d at 58 (citing Falcon, 457 U.S. at 157–59, 102 S.Ct. 2364 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.")).

Defendants' argument that typicality is lacking because both direct and indirect purchasers of fabricated products are included in the proposed subclasses is unavailing. Defendants maintain that each plaintiff that

unique to Cardinal can be bifurcated and re-

purchased fabricated products would have to demonstrate "that allegedly conspiratorial price increases were passed through to all purchasers of fabricated products," Defs.' Mem. at 27, in order to impose liability. In making this argument, defendants rely on the Supreme Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), wherein the Court held that indirect purchasers from an antitrust violator cannot pursue a Clayton Act claim.

Plaintiffs rejoin that they do not seek "only to recover the 'passed through' overcharges on fabricated products that resulted from a price fix on primary flat glass." Pls.' Reply Mem. at 28. Rather, plaintiffs argue "that the purpose and effect of defendants' conspiracy was to fix, raise and stabilize artificially the price of all flat glass products, both primary and fabricated, in both subclasses." Id.

As an initial matter, we note that defendants' reliance on Illinois Brick is misplaced, as plaintiffs' claims are limited to those persons who purchased fabricated products **directly** from defendants or their parents, subsidiaries or affiliates. Moreover, the Court of Appeals has held that, although Illinois Brick bars Clayton Act suits by persons who are not direct purchasers from an antitrust defendant, the decision does not preclude a suit by a plaintiff who purchases directly from the alleged offender, as did plaintiffs, but buys a product which incorporates the price-fixed product as one of its ingredients. See In re Sugar Indus. Antitrust Litig., 579 F.2d 13, 17–18 (3d Cir.1978). According to the Court, the "difficulty in computation here is not in parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff." Id. at 18.

Notwithstanding the fabricated products, of which flat glass is a component, we find that, assuming the accuracy of plaintiffs' contentions, the claims of purchasers of fabricated products (including ARG) can be proved by a common body of evidence and are typi-

solved, if need be, during the damages phase.

cal of the class claims. According to plaintiffs, defendants "control the supply and price of primary flat glass." Pls.' Reply Mem. at 26. Further, defendants dominate the fabricated segment of the industry, and primary flat glass is a significant cost component of the fabricated products. *Id.* at 26–27.

Further, plaintiffs detail the method by which defendants' conspiracy impacted downstream prices. Specifically, defendants allegedly monitored the downstream prices to determine whether the other defendants had implemented price increases. According to plaintiffs, if the downstream prices failed to show an increase in fabricated products, defendants could assume that the agreed upon price increase had not been implemented. *Id.* at 28 ("PPG will be monit[o]ring closely the AFGD, TempGlass, and HGP. If they do not show an increase in their fabricated products, [PPG] will assume manufacturers did not go up in these cases and will react accordingly."). Moreover, plaintiffs cite to an internal memo from Joe Hudson to Garry Goudy, both PPG employees, wherein Hudson raised and discussed three options for increasing prices in 1994 and for ensuring that the price increase would impact the downstream markets. *Id.* Assuming the accuracy of plaintiffs' contentions, and assuming defendants' market share and power are as significant as plaintiffs posit, purchasers of fabricated products would still need to establish a conspiracy. The issue raised by defendants seems more appropriately addressed during the damages phase where plaintiffs' challenge would be to isolate the "excessive cost" included in the fabricated product. *See In re Sugar,* 579 F.2d at 17–18 (same). This fact, however, does not defeat the typicality requirement.

Here, defendants' alleged price fixing conspiracy provides an appropriate basis for a finding of typicality. *See In re The Prudential,* 148 F.3d at 311. Because the class representatives, as well as the class members (including purchasers of fabricated products), must demonstrate the existence of a conspiracy to prevail on their respective claims, the representative claims are sufficiently typical of the class to satisfy the typicality requirement.

#### d. Adequacy of Representation

Rule 23(a)(4) requires a showing that the representative will fairly and adequately protect the interests of the class. The classic formulation of the adequacy test is stated in *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir.1968):

> To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiffs have interests antagonistic to those of the remainder of the class.

*Id.* at 562 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)); *see also Bogosian,* 561 F.2d at 449; *Hedges Enters.,* 81 F.R.D. at 466.

■■■ Thus, the adequacy of representation requirement encompasses two distinct inquiries designed to protect the interests of the absentee class members. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 801 (3d Cir.) (*"In re GMC"*), *cert. denied sub nom. General Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). First, it tests the qualifications of counsel to represent the class. *See id.* at 800, 116 S.Ct. 88; *Amchem,* 521 U.S. at 626 n. 20, 117 S.Ct. 2231; *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.) ("the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation ... and ... must not have interests antagonistic to those of the class"), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Second, it serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231; *Bogosian,* 561 F.2d at 449; *In re GMC,* 55 F.3d at 800.

■■■ With respect to the first inquiry, plaintiffs' counsel are lawyers with extensive experience in antitrust and multiparty litigation, and, according to plaintiffs, they "have served as lead or co-lead counsel in numer-

ous major class actions in courts located throughout the United States." Pls.' Mem. at 12. Indeed, defendants have not challenged the quality of the legal representation likely to be rendered on behalf of the class members. We therefore resolve the first inquiry in plaintiffs' favor without hesitation.

With respect to the second inquiry, defendants contend that plaintiffs' cannot satisfy the adequacy requirement because conflicts exists within the proposed subclasses. According to defendants, there are non-defendant fabricators who may also be class members. As such, defendants argue that plaintiffs may be forced to implicate some of these fabricators as coconspirators, thereby creating a conflict of interest. Further, defendants contend that Cardinal's circumstances "demonstrate the varied actual circumstances besetting any non-auto float class[.]" Defs.' Mem. at 36. Finally, defendants maintain that because transaction prices varied from buyer to buyer, plaintiffs' cannot satisfy the adequacy requirement. Plaintiffs rejoin that "the proposed class representatives have no antagonistic interests that would prevent continued vigorous representation." [15] Pls.' Mem. at 12–13.

Defendants' arguments regarding potential conflicts between the named class members and the classes are insufficient to preclude class certification. As plaintiffs note, courts have "rejected efforts ... to defeat certification by raising the possibility of hypothetical conflicts or antagonisms among class members," declining to consider such conflicts sufficient to defeat class action status at the outset "unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *See In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 513 (S.D.N.Y.1996) (quoting *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975)). Further, plaintiffs' amended complaint does not seek to implicate putative class members; therefore, "defendants cannot create a conflict of interest based upon the existence of a conspiracy that is not posited by plaintiffs." *In re Fine Paper*, 82 F.R.D. at 151; *accord In re Commercial Tissue Prods.*, 183 F.R.D. 589, 594 (N.D.Fla.1998).

Regarding defendants' arguments concerning Cardinal, we concede that Cardinal's circumstances are unique. However, we note that Cardinal is not a class representative and therefore would not adversely impact the course of litigation. We also note that, according to plaintiffs, in addition to AFG, Cardinal purchased flat glass from the remaining defendants. Thus, notwithstanding Cardinal's relationship with AFG, common issues still exist vis-a-vis Cardinal and the other defendants. Cardinal's interest in establishing the existence of a price-fixing conspiracy between the remaining defendants is common to the interests of the unnamed class members. Therefore, we find that no antagonism exists within the proposed classes with respect to proving that defendants did allegedly conspire to fix prices. *See In re NASDAQ*, 169 F.R.D. at 514.

Finally, notwithstanding the varied prices and products, this fact does not defeat the adequacy requirement in that each plaintiff seeks redress for the alleged damage sustained, irrespective of the market and product at issue. *See In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 614 (N.D.Ga.1997) ("parties with varying sales volumes and products may seek common antitrust relief without creating interests that are necessarily antagonistic."); *see also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D.Ga.1991) (finding adequacy requirement satisfied despite fact that members of class purchased varying products at fluctuating prices in different markets). Moreover, the fact that individual issues might arise does not defeat our finding that the proposed class representatives can consistently pursue and protect the classes' claims while litigating individual issues that may arise in connection with their own claims. *See generally In re American Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir.1996) ("Adequacy of representation" means that the class representative has common interests with unnamed class members and will

---

15. The proposed class representatives include AAA Glass, Inc.; All Star Glass, Inc.; Bailes Glass Co.; George Brown & Son Glass Works, Inc.; Mayflower Sales Co., Inc.; Port City Glass & Mirror, Inc.; and The Lurie Companies. *See* Doc. No. 109 at 2.

vigorously prosecute the interests of the class through qualified counsel.) (citations omitted). We find that plaintiffs' interests are "sufficiently aligned that the class representatives can be expected to adequately pursue the interests of the absentee class members." *See In re The Prudential,* 148 F.3d at 312.

### 2. Rule 23(b)(3) Class Certification Requirements

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.' " *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231; *accord In re The Prudential,* 148 F.3d at 313–14. In adding " 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231. Before making a finding on predominance, a court must identify the common issues involved in the lawsuit, and before making its finding on the superiority of the class action device, a court must apply the fairness and efficiency criteria contained in the rule. *See Bogosian,* 561 F.2d at 448. We turn to the relevant issues raised by plaintiffs' complaint.

### a. Issues Presented

■ Plaintiffs seek redress for defendants' alleged price-fixing conspiracy, in violation of § 1 of the Sherman Act. § 1 provides, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal[.]" 15 U.S.C. § 1 (1997). To establish a § 1

violation, plaintiffs must prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1229 (3d Cir.), *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.,* 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

■ Another issue relevant to the pending action involves fraudulent concealment. The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until" the defendant "could plead the statute of limitations to protect it." *Bailey v. Glover,* 21 Wall. 342, 88 U.S. 342, 349, 22 L.Ed. 636 (1874).[16] Thus, pursuant to this doctrine, "when the fraud has been concealed or is of such a character as to conceal itself," and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud. *Id.*

■ A party seeking to invoke the doctrine of fraudulent concealment must demonstrate that (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *See In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.), *cert. dismissed sub nom. Bessemer & Lake Erie R. Co. v. Republic Steel Corp.,* 510 U.S. 1021, 114 S.Ct. 625, 126 L.Ed.2d 589 (1993); *see also Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir.1995). We will consider these issues in the context of Rule 23(b)(3).

---

**16.** Although *Bailey* was a fraud action, the Supreme Court subsequently stated that the fraudulent concealment tolling doctrine is to be "read

into every federal statute of limitation." *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

### b. Predominance [17]

Rule 23(b)(3) requires that common "questions of law or fact ... predominate over any questions affecting only individual members." Common questions of law and fact exist where either the "applicable principles of law or the proof necessary to establish an element of the particular claim are the same for each member of the class. However, Rule 23 requires more than a consideration of commonality in the ultimate questions of law and fact; it also requires close consideration of the separate questions of law or fact which determine the ultimate issues." *Hedges Enters.*, 81 F.R.D. at 472. Where many significant questions are common to the class, predominance is satisfied. *See generally Amchem*, 521 U.S. at 624, 117 S.Ct. 2231 ("Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard").

### i. § 1 Violation/Conspiracy

Plaintiffs argue that the predominance requirement is satisfied because the following issues are common to the proposed classes: (1) the existence and scope of the alleged conspiracy, (2) the issue of fraudulent concealment, and (3) the fact of damage. Therefore, plaintiffs contend, common issues will overwhelm individual issues. Defendants' arguments, at bottom, are that individual questions will predominate with respect to the following essential elements of plaintiffs' actions: (1) the existence of a § 1 violation/conspiracy, (2) impact or fact of damage, (3) amount of damage, and (4) fraudulent concealment.

As an initial matter, we note that the Supreme Court has stated "predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231. Indeed, the central claim of plaintiffs' consolidated complaint on behalf of themselves and the classes that they seek to represent is that defendants conspired to raise, fix, maintain and stabilize the prices of flat glass and all flat glass products. On the basis of the record presently before us, we find that the proof necessary to demonstrate the existence, implementation and effect of this "alleged conspiracy would require a 'common thread of evidence' which would 'correspond to evidence which otherwise would be introduced by absentee class members,' *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. at 345 [citations omitted], and that this issue is, therefore, common to all members of the class." *Hedges Enters.*, 81 F.R.D. at 473–74; *see also Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 36–37 (S.D.N.Y.1977), *appeal dismissed*, 574 F.2d 656 (2d Cir.1978); *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733–34 (N.D.Ill.1977). Indeed, consideration of the conspiracy issue would, of necessity, focus on defendants' conduct, not the individual conduct of the putative class members. *See, e.g., In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1039 (N.D.Miss.1993) ("evidence of a national conspiracy to fix the price of catfish and processed catfish would revolve around what Defendants did, and said, if anything, in pursuit of a price fixing scheme"); *Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D.Tex.1990) (proof of conspiracy is susceptible to generalized proof since the focus is on what defendants said and did).

With respect to defendants' arguments regarding diverse products, markets and pricing, in light of the alleged price increase announcements, internal documents and proposed witnesses, we fail to see how the existence of these factors would prevent plaintiffs from establishing an overarching conspiracy based on a common body of evidence. "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have found the conspiracy

---

17. As the Supreme Court noted in *Amchem*, "the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that 'claims or defenses' of the named representatives must be 'typical of the claims or defenses of the class.' " 521 U.S. at 623 n. 18, 117 S.Ct. 2231.

issue the overriding predominant question." *In re Folding Carton*, 75 F.R.D. at 734; *see also In re Fine Paper*, 82 F.R.D. at 151. Further, where a § 1 conspiracy is alleged, as here, it is appropriate to look beyond surface distinctions between the products because identical products, uniform prices and unitary distribution patterns are not indispensable for class certification in this context. *See In re Fine Paper*, 82 F.R.D. at 151; *Shelter Realty*, 75 F.R.D. at 37. More importantly, any difference in the manner in which the conspiracy was manifested throughout the marketing and distribution of the various products does not change the common question, namely, whether defendants acted in concert to decrease competition among themselves.

Defendants also argue that plaintiffs cannot prove the conspiracy because plaintiffs evidence, to wit, the price announcements, does not cover all of the products included within the proposed subclasses. Specifically, defendants repeatedly note that the price announcements do not cover ARG, which includes truckload pricing and wholesale pricing.

As an initial matter, we note that plaintiffs are not relying exclusively on price announcements to establish the alleged conspiracy. Indeed, plaintiffs' amended complaint references internal documents submitted by defendants, details conversations wherein defendants allegedly discussed price fixing with others, and provides statements and conduct allegedly made and undertaken by former employees, which will not vary among the class members. *See* Consolidated and Am. Class Action Compl. ¶ 63(a)–(p) (detailing alleged meetings and conversations).

Further, plaintiffs argue that:

except for AFG, PPG and Ford, [defendants] issued truckload price increases. Those truckload price increases were then submitted to NAGS, National Auto Glass Specifications, which chose one of them. The other defendants then adjusted their prices, and then there became a NAGS price, **and the NAGS price which was based upon the defendants' quote prices was then used at the wholesale level** . . . . And defendants had price increase an-

nouncements in the ARG area of the business. They issued price increase announcements, percentage price increases[.] Tr. of Oral Arg. Opposing Class Certification at 41–42 (emphasis added). Assuming the accuracy of plaintiffs' contentions, this common evidence could support a conclusion that defendants engaged in a conspiracy to fix prices in the proposed ARG subclass as well as the flat glass subclass.

Moreover, we note that the parties have not engaged in merits discovery. Upon the completion of discovery, plaintiffs may secure additional information (in addition to the price announcements and the potential witnesses) supporting their conspiracy claim. Further, "[a]n agreement need not be explicit to result in § 1 liability, . . . and may instead be inferred from circumstantial evidence." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir.1994), *cert. denied*, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). "[D]irect evidence of concerted action is not required." *Id.* We find that plaintiffs' proposed evidence to establish the existence of a conspiracy, and the issues raised by the conspiracy, are common to the putative class members.

### ii. Impact

Defendants argue at great length that plaintiffs' ability to establish impact or the fact of damage is an overwhelmingly individual issue, and one that defeats class certification; that is, defendants contend that impact cannot be proven by use of a common body of evidence because varied products, markets and supply and demand considerations are involved. Further, defendants argue that some plaintiffs individually negotiated transaction prices for products within the proposed subclasses and actual prices each plaintiff paid varied between purchasers, thereby precluding class treatment.

Arguments similar to these were analyzed and rejected by the Court of Appeals in *Bogosian*. There, the Court noted that:

when an antitrust violation impacts upon a class of person who do have standing, **there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof**

**adequately demonstrates some damage to each individual.** Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.....

**If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price.** If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

*Bogosian,* 561 F.2d at 454–55 (emphasis added); *accord In re Fine Paper,* 82 F.R.D. at 153–54.

More importantly, the proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members. Therefore, even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied. *See Bogosian,* 561 F.2d at 455; *accord In re Plywood Anti Trust Litig.,* 76 F.R.D. 570, 584 (E.D.La.1976) ("if the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host of individual questions which destroys the requisite predominance of questions common to the classes").

Furthermore, plaintiffs' expert, Dr. John C. Beyer, opines that, by using a regression analysis, plaintiffs can establish the fact of damage for the proposed subclasses. Defendants, relying on their own expert, Professor Robert D. Willig, rejoin that plaintiffs' expert's analysis is fundamentally flawed and does not prove impact on a class-wide basis.

Multiple regression analysis is a statistical technique designed to determine the effect that two or more explanatory independent variables have on a single dependent variable. *See, e.g.,* DANIEL L. RUBINFELD, Reference Guide on Multiple Regression, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 419 (Federal Judicial Center 1994). This method allows an expert to test the causal relationship, if any, between the explanatory independent variables and the dependent variable. *Id.* There is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation. *See generally Petruzzi's,* 998 F.2d at 1238 (noting the acceptability and reliability of multiple regression analysis). Indeed, "regression and statistical analysis have been admitted in antitrust cases to prove injury and to determine damages." *Id.* (finding use of multiple regression analysis reliable under Rule 702); *see also City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 566 (11th Cir.1998) (expert's compilation of data from business records and analysis with simple arithmetic, algebra, and multiple regression analysis is well-established as a reliable methodology), *reh'g en banc denied,* 172 F.3d 884 (11th Cir.), *and cert. denied,* —— U.S. ——, 120 S.Ct. 309, 145 L.Ed.2d 42 (1999); *Askew v. City of Rome,* 127 F.3d 1355, 1365 n. 2 (11th Cir. 1997) (district court admitted expert statistical testimony based in part on multiple regression analysis in voting rights case), *reh'g en banc denied,* 136 F.3d 1333, 1998 WL 67172 (11th Cir.1998).

For purposes of class certification, we find that plaintiffs have presented a viable meth-

od for proving class-wide impact in both proposed subclasses. At this point of the proceedings, it would be improper to make a determination as to the likely success of using a multiple regression analysis. Rather, we need only concern ourselves with whether plaintiffs have identified a valid method for determining damages, as they have. *See, e.g., In re Domestic Air,* 137 F.R.D. at 692–93 ("It is not the function of the Court at this time to determine whether [the expert] is correct. The weight to be given his testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date.... It is not necessary that plaintiffs show that [the expert's] methods will work with certainty at this time."); *Lumco Indus., Inc. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 174 (E.D.Pa.1997) (at this point, ... plaintiffs are not required to come forward with more specific formulas for calculating damages[,] as the proposed methodologies have been accepted by courts in similar class actions). In light of the conflicting expert evidence presented, and the parties' detailed arguments, we find that such arguments go to the weight of the testimony and must be resolved by the finder of fact. Moreover, if the ultimate experience proves that there are problems in proving damages that outweigh the advantages of class certification, this court can, at a later date, pursuant to Rule 23(c)(4)(A), give appropriate consideration of a class limited to the determination of liability. *See Bogosian,* 561 F.2d at 456.

### iii. Amount of Damage

With respect to the amount of damage, the Court of Appeals has stated that "[b]ecause separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device." *In re GMC,* 55 F.3d at 817 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)); *accord In re Fine Paper,* 82 F.R.D. at 154 ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."); *Bogosian,* 561 F.2d at 456. Accordingly, defendants' arguments aside, the need

to determine the amount of damage sustained by each plaintiff is an insufficient basis for which to decline class certification.

Further, "[t]he difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the predominating, common issues." *In re Catfish,* 826 F.Supp. at 1042. As one commentator noted, "[i]t is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." *See* 4 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 18.27, at 4S–16 (3d ed. Supp.1998). Notwithstanding the potential for individual issues to arise in this context, this fact does not defeat class certification. *See, e.g., Bogosian,* 561 F.2d at 456.

### iv. Fraudulent Concealment

To toll the four-year statute of limitations of the Clayton Act, and to be entitled to establish claims which extend beyond that period, plaintiffs must demonstrate that defendants fraudulently concealed their unlawful activities and that each plaintiff did not discover these facts despite the exercise of due diligence. It generally has been recognized that the question of concealment by the antitrust defendant is a common question, subject to being uniformly resolved on behalf of all members of the class. *See, e.g., In re NASDAQ,* 169 F.R.D. at 519; *In re Fine Paper,* 82 F.R.D. at 154–55. However, the question of discovery of the cause of action by a plaintiff presents an individual question. Similarly, the issue of due diligence seemingly raises an individual question. Thus, the broad issue of fraudulent concealment presents both common and individual issues; therefore, the determination whether an antitrust action involving fraudulent concealment may proceed as a class action turns upon which aspect of the issue may be considered to predominate. *See Hedges Enters.,* 81 F.R.D. at 476.

Defendants argue that these issues are highly personal, susceptible only of individualized proof and, therefore, inappropriate for class treatment because common questions of

law and fact would not then predominate. In reply, plaintiffs argue that the bulk of proof necessary to establish fraudulent concealment—the fact of concealment—would be common to every plaintiff and that the individual issues of due diligence and success of concealment would require such a small quantum of proof that the common proof would predominate with respect to this issue. Pls.' Reply Mem. at 31–33.

We agree with plaintiffs and find that the issue of the fact of concealment is the predominating question, even though other individual questions are present, because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did, rather than what plaintiffs did. *See, e.g., Abramovitz v. Ahern*, 96 F.R.D. 208, 218 (D.Conn. 1982) (issue of whether fraudulent concealment would toll the statute of limitations was common to all class members); *In re Plywood Anti-Trust Litig.*, 76 F.R.D. at 586 ("fraudulent concealment issues appear to be generally common to all members in each of the classes"); *Hedges Enters.*, 81 F.R.D. at 476 (common issues predominate with respect to fraudulent concealment issue); *In re Sugar*, 73 F.R.D. at 348. Indeed, the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants. Thus, the crucial common questions on the fraudulent concealment issues will relate to whether defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class. *See In re Fine Paper*, 82 F.R.D. at 154–55 ("The key question on the issue of fraudulent concealment will relate to whether defendants successfully concealed the existence of the alleged conspiracy, and the **proof of this contention [what defendants did] will necessarily be common among the class members.**") (emphasis added); *Fisher Bros. v. Mueller Brass Co.*, 102 F.R.D. at 578–79; *In re Sugar*, 73 F.R.D. at 348; *In re NASDAQ*, 169 F.R.D. at 519.

With respect to the individual issues raised by fraudulent concealment, they may be adjudicated in the same fashion and at the same time as the individual damages issues, should they arise. *See In re Fine Paper*, 82 F.R.D. at 154–55 ("bifurcation of this litigation into liability and damage segments remains an option if the predominating elements of the question of fraudulent concealment do not prove susceptible to generalized proof"). Balancing the alternative of not certifying the litigation for class action treatment, against the public policy of utilizing private class actions to enforce the antitrust statutes, we hold that the individual aspects of the question of fraudulent concealment do not predominate over the other common issues.

In conclusion, we find that the issues of conspiracy and fact of damage are common to the class and that, while the issues of damages and fraudulent concealment contain both common and individual questions, the common issues predominate with respect to those issues. On balance, therefore, those questions of law and fact which are common to the members of the class predominate over those affecting only individual members and, thus, Rule 23(b)(3)'s predominance requirement is satisfied.

#### c. Superiority

Finally, Rule 23(b)(3) requires that plaintiffs demonstrate "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Several factors that are relevant to the superiority inquiry include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*In re The Prudential*, 148 F.3d at 315 n. 56. Thus, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternate available methods of adju-

dication.' " *Id.* at 316; *Georgine,* 83 F.3d at 632.

■ Defendants argue that class treatment is not superior to other available methods of adjudication because "the proceedings would become so bogged down in individual issues that class proceedings would be unmanageable." Defs.' Mem. at 57. Specifically, defendants contend that: (1) class treatment would not serve the interests of judicial economy, because the multitude of individual issues in this case would require extensive mini-trials; (2) a single jury would be unable to absorb, remember or carefully consider the vast and complex issues presented by this case; (3) "plaintiffs' proposed class includes purchasers who cannot readily be identified and who present unique problems[,]" and (4) plaintiffs cannot calculate damages on a class-wide basis. *Id.* at 57–58.

We find that class treatment of the instant case would be the fairest and most efficient method of adjudicating this controversy and that a class action is superior to other available methods of adjudication. A class action will serve judicial economy, as the proposed subclasses are alleged to have members numbering in the hundreds and possibly thousands, *see, e.g., In re Folding Carton,* 75 F.R.D. at 733, and, based on defendants' arguments, some members claims, to the extent they exist, are minimal. *See* Defs.' Mem. at 31 n. 26 ("Even if the 30%–35% given by Dr. Beyer could be credited, it would confirm the very minimal effect any flat glass conspiracy would have on price in the fabricated markets"). Individual actions would be unnecessarily duplicitous, expensive and time-consuming, particularly in light of the predominance of common questions of the alleged conspiracy, impact and fraudulent concealment. *Id.* Furthermore, the predominance of common questions inherent in this action would be beneficial to defendants in that they need defend against plaintiffs' allegations in one proceeding and, if successful, need not fear individual actions with respect to the same issues ad infinitum.

In addition, although some plaintiffs might be able, not all plaintiffs will be able to pursue their claims absent a class action proceeding. Indeed, class members who, because of the tremendous cost of discovery and trial that are present in any alleged conspiracy among large business corporations, might not otherwise be able to pursue their claims, are able to share the costs among themselves and thereby have their claims adjudicated in a single lawsuit. *See In re Fine Paper,* 82 F.R.D. at 155. Although plaintiffs have not set forth the amount of damage suffered by each plaintiff, defendants, in their papers, have argued that, with respect to certain products, any alleged injury, assuming it exists, would be minimal. Given the assertion that some plaintiffs have relatively modest claims, it is apparent that a class action is the only rational avenue of redress for these individuals. *See In re The Prudential,* 148 F.3d at 316.

Although individual questions will require the introduction of individual proof, which may become lengthy or complex, we do not at this time interpret that fact as necessarily rendering this class action unmanageable. *See, e.g., Shelter Realty,* 75 F.R.D. at 38–39. Furthermore, in comparison to the estimated class size, there are a relatively small number of suits pending against defendants. This fact indicates that many individuals lack a compelling interest in controlling the prosecution of their claims.

We also find that it is appropriate to litigate the case here in Pennsylvania, as both plaintiffs and defendants requested this forum, and it is the principal place of business for several named plaintiffs as well as for defendant PPG, which is, according to plaintiffs, "the third largest producer of flat glass in the world ... [and] the largest producer of flat glass" in the United States. Consolidated and Am. Class Action Compl. at 16–17. Further, according to plaintiffs, each defendant "resides, transacts business, is found and/or has agents in this district, and ... a substantial part of the events giving rise to plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce ... has been carried out in this district." *Id.* at 2.

To the extent that defendants argue that a multiplicity of products and conspiracies render the handling of many claims in one lawsuit unmanageable, and that determining

damages would be impossible, defendants are essentially restating the arguments, already rejected by the court, that there are no predominating common questions which can most expeditiously and economically be treated on a class basis. Apart from their contention that individual actions brought by class members are superior to class certification in this litigation, defendants have not urged that other possible methods of adjudication are preferable to class action treatment. Again, the court finds that individual suits would be duplicative, expensive and time consuming and would offer no countervailing benefits.

Although we recognize that the pending action will present many complexities and problems, we are mindful that:

> [F]or a court to refuse to certify a class (action) on the basis of speculation as to the merits of the cause or because of vaguely-perceived management problems is counter to the policy which originally led to the rule, and more especially to its thoughtful revision, and also to discount too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise.

*Yaffe v. Powers,* 454 F.2d 1362, 1365 (1st Cir.1972).

The court is fortunate in this litigation to have the assistance of able lawyers for all parties who have already demonstrated a willingness to work together. With their help, with the suggestions embodied in the Manual for Complex Litigation, and through the use of the powers provided by the Federal Rules of Civil Procedure, the court is confident that whatever problems may arise from certification of the subclasses of nationwide direct purchasers can be satisfactorily resolved.

### Conclusion

We will grant plaintiffs' motion for class certification. An appropriate order will follow.