## In re UNIVERSAL SERVICE FUND TELEPHONE BILLING PRACTICES LITIGATION.

No. 02–MD–1468–JWL.

United States District Court, D. Kansas.

Feb. 13, 2004.

Isaac L. Diel, Diel & Seelman, P.C., Prairie Village, KS, Jennifer F. Connolly, The Wexler Firm, Chicago, IL, Marc R. Stanley, Stanley Mandel & Iola, Dallas, TX, for Plaintiff.

Christopher J. Leopold, Mark M. Iba, Stinson Morrison Hecker LLP, Kansas City, MO, Julie E. Grimaldi, Overland Park, KS, Mark D. Hinderks, Stinson Morrison Hecker LLP, Overland Park, KS, Lynn S. McCreary, Bryan Cave LLP, Kansas City, MO, Mark B. Blocker, Sidley, Austin, Brown & Wood, Chicago, IL, for Defendant.

Fred Campbell, Michael Nilsson, Patrick O'Donnell, Harris, Wiltshire & Grannis, LLP, Washington, DC, for Respondent.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This multidistrict litigation consists of numerous putative class action lawsuits arising from the practices of defendants AT & T Corporation ("AT & T") and Sprint Communications Company, L.P. ("Sprint") and nonparties MCI WORLDCOM Network Services, Inc. and MCI WorldCom Communications, Inc. (collectively "MCI")[1] of charging their customers to recoup their contributions to the federal Universal Service Fund ("USF") program. Plaintiffs are customers

---

1. These MCI entities are subsidiaries of WorldCom, Inc. and, like WorldCom, Inc., have filed for bankruptcy. The bankruptcy court declined to lift the automatic stay to allow plaintiffs to pursue their claims against MCI, and therefore plaintiffs are currently precluded from naming either of these MCI entities as defendants in this case.

or former customers of defendants and MCI who allege defendants engaged in an illegal scheme of conspiring to overcharge them for USF-fund surcharges, thereby creating a secret profit center. This matter is presently before the court on plaintiffs' motion for class certification (Doc. 102). For the reasons explained below, the court will grant this motion as modified by plaintiffs' revised proposed class definition (Doc. 223) and clarified by plaintiffs' supplemental memorandum (Doc. 236).

## FACTUAL BACKGROUND

The Federal Communications Commission (the "FCC") administers the USF, a federal fund that subsidizes telecommunications service for low-income consumers, consumers in rural and high-cost areas, schools, libraries, and health care providers. 47 U.S.C. § 254. Long distance carriers such as defendants are required to contribute a percentage of their revenues to maintaining the USF. *Id.* All major long distance carriers attempt to recover the costs of their contributions to the USF fund from their customers by way of line-item surcharges.

Plaintiffs are customers or former customers of defendants and MCI who allege defendants engaged in an illegal scheme of conspiring to overcharge them for these USF surcharges, thereby creating a secret profit center. For example, plaintiffs allege that the FCC USF contribution factor during the relevant time period in 2001 and 2002 ranged from 6.8% to 7.28%, and that during this same time period defendants and MCI imposed USF surcharges on their residential customers ranging from 9.9% to 11.5% and USF surcharges on their business customers ranging from 7.5% to 10.6%. Defendants explain that this disparity is attributable to several factors such as their declining long distance revenues, uncollectible accounts, and their attempts to recoup their costs to administer the program.

Plaintiffs' second consolidated and amended class action complaint (hereinafter referred to as simply the "complaint") asserted a number of claims against defendants. On December 1, 2003, the court entered a memorandum and order that compelled arbitration of certain aspects of some of the plaintiffs' claims, dismissed certain aspects of some of the plaintiffs' claims, and referred plaintiffs' claims under §§ 201(b) and 202(a) of the Federal Communications Act ("FCA"), 47 U.S.C. §§ 151 *et seq.*, to the Federal Communications Commission to exercise primary jurisdiction. *See generally In re Universal Serv. Fund Tel. Billing Practices Lit.*, No. 02–1468, 300 F.Supp.2d 1107, ——––——, 2003 WL 23219878, at *1–*40 (D.Kan. Dec.1, 2003). Given the court's rulings in that memorandum and order, the claims remaining in this court that are not currently stayed include: (1) the post-detariffing aspect of the business customers' and the AT & T California residential customer's antitrust claim under the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15; (2) the post-detariffing aspect of the Sprint business customers' claim under the Kansas Consumer Protection Act, K.S.A. §§ 50–623 *et seq.* ("KCPA"); and (3) the business customers' and the AT & T California residential customer's breach of contract claim. Plaintiffs now seek class certification with respect to certain aspects of their antitrust claim as well as their breach of contract claim. Plaintiffs' supplemental brief clarifies that they do not seek class certification with respect to their claim under the KCPA or the aspect of their antitrust claim involving an alleged conspiracy to implement arbitration clauses.

Plaintiffs' antitrust claim is asserted by all plaintiffs against both AT & T and Sprint. Plaintiffs ask the court to certify the following class with respect to this antitrust claim (the "conspiracy class"):

> All business long distance customers of AT & T, Sprint, or MCI in the United States and all residential long distance customers of AT & T in California who paid a USF charge on or after August 1, 2001.[2]

2. Excluded from plaintiffs' proposed class and subclass definitions are defendants and MCI; any subsidiary, affiliate or other entity in which defendants or MCI have a controlling interest; any employees, officers, or directors of defendants or MCI; legal representatives, successors, or assigns of defendants or MCI; and any justice, judge or magistrate judge of the United States

This proposed conspiracy class would include the following named plaintiffs: Roger Gerdes, an AT & T long distance residential customer[3] in California; Goldman & Hellman, P.A. ("Goldman & Hellman"), an AT & T long distance business customer; Lady Di's, Inc. ("Lady Di's"), an AT & T long distance business customer; Sterling Beimfohr d/b/a Sterling Sails ("Sterling Sails"), an AT & T long distance business customer; Pressman Toy Co. ("Pressman Toy"), a Sprint long distance business customer; B & C Values, Inc. ("B & C Values"), a Sprint long distance business customer; and NYLB, Inc. d/b/a Siany ("NYLB"), an MCI long distance business customer.

Plaintiffs' breach of contract claim is asserted by the AT & T customers against AT & T and by the Sprint customers against Sprint. Plaintiffs ask the court to certify the following two subclasses with respect to this claim (the "AT & T subclass" and the "Sprint subclass"):

All business long distance customers of AT & T in the United States and all residential long distance customers of AT & T in California who paid a USF charge between August 1, 2001, and March 31, 2003.

All business long distance customers of Sprint in the United States who paid a USF charge between August 1, 2001, and March 31, 2003.

Mr. Gerdes, Goldman & Hellman, Lady Di's, and Sterling Sails are the proposed named plaintiffs of the AT & T subclass. Pressman Toy and B & C Values are the proposed named plaintiffs of the Sprint subclass.

## LEGAL STANDARD FOR CLASS CERTIFICATION

The decision whether to certify a class is committed to the broad discretion of the trial court. *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir.2003); *Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir.1999); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir.1999). The court must per-

form a rigorous analysis of whether the proposed class satisfies the requirements of Rule 23. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir.1988) (party seeking to certify a class is under a strict burden of proof to show that all of the requirements are met). The court should accept the allegations in the complaint as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." *Hart*, 186 F.3d at 1290 n. 7 (quotation omitted; brackets in original). The court may not inquire into the merits of the case. *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982).

The standards for certifying a class action are set forth in Fed.R.Civ.P. 23. This rule requires all four prerequisites of Rule 23(a) and at least one of the three requirements of Rule 23(b) to be satisfied. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Integra Realty Res.*, 354 F.3d 1246, 1262 (10th Cir. 2004).

## DISCUSSION

As explained below, the court finds that the four prerequisites of Rule 23(a)—that is, numerosity, commonality, typicality, and adequacy of representation—are satisfied with respect to the proposed class and both proposed subclasses. The requirements of Rule 23(b)(3) are also satisfied because common questions of law and fact will predominate this case and a class action is the most superior method for adjudicating this controversy. The court will also certify the conspiracy class pursuant to Rule 23(b)(2) because defendants have allegedly acted on grounds generally applicable to the class with respect to their USF-fund recovery practices,

---

who may hear the case, individually or as a fiduciary, and all other related persons, as defined in 28 U.S.C. § 455(b).

**3.** These named plaintiffs are not necessarily still customers of the companies listed. More accu-

rately, the complaint alleges they were customers during at least a portion of the relevant time period. For ease of reference, however, the court will simply refer to each named plaintiff as an AT & T, Sprint, or MCI customer.

and therefore final injunctive relief may be warranted with respect to the conspiracy class as a whole. Accordingly, the court will certify the conspiracy class, the AT & T subclass, and the Sprint subclass under the class definitions set forth above. Further, the court will appoint co-lead counsel in this multidistrict litigation as class counsel.

## I. Rule 23(a) Requirements

Rule 23(a) provides four prerequisites for class certification. Specifically, it provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Integra Realty,* 354 F.3d at 1262 n. 3. Thus, the court must examine whether these four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied in this case.

### A. Numerosity

▇▇▇ Rule 23(a)(1) allows certification of a class only if the proposed class is so large that joinder of all class members would be impracticable. In order to satisfy this numerosity requirement, plaintiffs "must present some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Rex v. Owens,* 585 F.2d 432, 436 (10th Cir.1978). Plaintiffs have submitted exhibits which state that publicly available records reflect that the proposed conspiracy class, the AT & T subclass, and the Sprint subclass will consist of millions of long distance customers dispersed across the country. Based on this information, the court finds plaintiffs have satisfied the numerosity requirement with respect to the proposed class and each of the proposed subclasses because joinder of all class members would be impracticable. Indeed, defendants do not dispute that the proposed class and each of the proposed

subclasses satisfy the numerosity requirement.

### B. Commonality

Rule 23(a)(2) requires the presence of questions of law or fact common to the class. The question of commonality under Rule 23(a)(2) is different from the question of whether common questions predominate under Rule 23(b)(3). The predominance and superiority requirements of Rule 23(b)(3) are far more demanding than Rule 23(a)(2)'s commonality requirement. *Amchem Prods.,* 521 U.S. at 624, 117 S.Ct. 2231. Under Rule 23(a)(2), a finding of commonality "requires only a single issue common to the class." *Hart,* 186 F.3d at 1288.

▇▇▇ The court is satisfied that the members of the conspiracy class share common issues of law and fact. These include, for example, whether defendants and MCI engaged in a combination or conspiracy to raise, fix, stabilize, and maintain USF surcharges at supracompetitive levels; the effect of the alleged combination or conspiracy on their respective surcharge rates; and whether the alleged combination or conspiracy violated the antitrust laws. *See, e.g., In re Monosodium Glutamate Antitrust Lit.,* 205 F.R.D. 229, 232 (D.Minn.2001) ("Common questions are often found in antitrust price-fixing conspiracy cases, because by their nature, these cases deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy."); *In re Playmobil Antitrust Lit.,* 35 F.Supp.2d 231, 240 (E.D.N.Y.1998) (collecting case law; explaining that courts generally find commonality requirement satisfied in cases where the complaint alleges price fixing); *In re Aluminum Phosphide Antitrust Lit.,* 160 F.R.D. 609, 613 (D.Kan.1995) (finding commonality requirement satisfied in antitrust price-fixing case); *see generally* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1763, at 204 & n. 11 (2d ed. 1986 & Supp.2003) (observing that "[t]he claimed existence of a conspiracy to fix prices ... in violation of the antitrust laws has been found to present common questions"; citing an abundance of case law on this issue).

■ The court is also satisfied that the members of the AT & T subclass and the Sprint subclass, respectively, share common issues of law and fact. Plaintiffs' second amended complaint alleges AT & T breached the "General Terms and Conditions" of its business service guide, part of its business customer contracts, and the "Miscellaneous Charges and Taxes" section of its service guide that is a part of its residential customer contracts. One of the common issues among the AT & T subclass will be whether AT & T breached these provisions in its standard form contracts by virtue of its USF-fund recovery practices. Similarly, the complaint alleges Sprint breached section 10.1 of its Terms and Conditions of Schedule No. 3 of its business customers' contracts. Thus, as with the AT & T subclass's breach of contract claim, one of the common issues among the Sprint subclass will be whether Sprint breached this provision in its standard form contract.[4] Thus, the court finds that the proposed commonality requirement is satisfied with respect to each of the proposed subclasses. *See, e.g., In re Tri–State Crematory Lit.*, 215 F.R.D. 660, 692 (N.D.Ga.2003) (finding commonality requirement satisfied in breach of contract claim involving form contracts); *Jones v. Am. Gen. Life & Acc. Ins. Co.*, 213 F.R.D. 689, 694–95 (S.D.Ga.2002) (same); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co.*, 121 F.R.D. 664, 669 (N.D.Ill.1988) (finding commonality agreement satisfied where plaintiffs' claims arose from allegations of common practice and rights derived from form contracts; case presented "the classic case for treatment as a class action" (quotation omitted)).

### C. Typicality

Plaintiffs must also show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ P. 23(a)(3). A finding of typicality under Rule 23(a)(3) "does not require that the claims of class members be identical to the claims of the class plaintiffs." *Hart*, 186 F.3d at 1299. " '[D]iffering fact situations of class members do not defeat typicality ... so long as the claims of the class representative and class members are based on the same legal or remedial theory.' " *Id.* (quoting *Adamson*, 855 F.2d at 675).

■ The named plaintiffs and the proposed members of the conspiracy class were all allegedly victims of the conspiracy among defendants and MCI to artificially inflate their USF surcharge rates and to use that surcharge as a secret profit center. Further, the breach of contract claims of the named plaintiffs of the AT & T and Sprint subclasses are representative of those of the other class members. Therefore, the court is satisfied that the named plaintiffs' claims are typical of those of the other class members. *See, e.g., In re Linerboard Antitrust Lit.*, 203 F.R.D. 197, 207 (E.D.Pa.2001) (noting the typicality requirement is generally satisfied in antitrust disputes because the named plaintiffs need to prove a conspiracy, its effectuation, and damages, which is precisely what the absentee class members must also prove; citing case law), *aff'd*, 305 F.3d 145 (3d Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 116 (D.Kan.1995) (finding the typicality requirement satisfied in breach of contract claim).

Sprint, however, argues the breach of contract claims of Pressman Toy and B & C Values are not typical of those of the other class members because the complaint alleges a breach of section 10.1 of the terms and conditions of "Schedule No. 3" of the Sprint business customers' contracts, and Sprint's contracts with Pressman Toy and B & C Values do not contain a Schedule No. 3. In response, plaintiffs request leave to amend their complaint to allege a breach of section 10.8 of Schedule No. 11. At the class certification hearing, plaintiffs clarified that the issue is merely one of identifying the location of the relevant contractual provision. The substance of the contractual provision remains the same, and therefore the breach of contract claims of Pressman Toy and B & C

---

**4.** Even if plaintiffs amend their complaint to identify a different contractual provision, the substance of the relevant provision that Sprint allegedly breached will remain the same. *See infra* Section I(C).

Values are typical of those of the other members of the Sprint subclass. The court hereby grants plaintiffs leave, as requested, to file an amendment to their complaint on or before **February 27, 2003**. The pleading shall be entitled "Amendment to Second Consolidated and Amended Class Action Complaint," and it may only amend plaintiffs' breach of contract claim against Sprint. It shall set forth only the pertinent amended allegations and shall not reiterate any of the other allegations in plaintiffs' complaint.

### D. Adequacy of Representation

Rule 23(a)(4) requires that the named plaintiff must fairly and adequately protect the interests of class members. To meet this requirement, the named plaintiff must be a member of the class he or she seeks to represent. *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir.2002) (quotation omitted), *cert. denied*, —— U.S. ——, 123 S.Ct. 2275, 156 L.Ed.2d 130 (2003); *see also Amchem Prods.*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231 (1997) ("The adequacy heading also factors in competency and conflicts of class counsel."); Fed.R.Civ.P. 23 advisory committee notes to the 2003 amendments ("Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative . . . .").

The court is satisfied that class counsel will fairly and adequately protect the interests of class members, as counsel have vigorously prosecuted this case thus far and the record does not reveal any potentially problematic conflicts of interest. In this case, the parties dispute the adequacy of the proposed named plaintiffs. Defendants argue the proposed named plaintiffs are inadequate class representatives because: (1) they have demonstrated an obvious disregard for the interests of the class by abandoning their fraud claim in an attempt to obtain class certification, *i.e.*, they have split their claims; and (2) they have impermissibly abdicated their role as class representatives to their attorneys.

### 1. Splitting of Plaintiffs' Claims

■ Defendants contend the proposed named plaintiffs have disregarded the interests of the class members by abandoning their fraud claim "in order to grease the wheels of class certification." Defs.' Joint Opp'n to Pls.' Mot. for Class Certification (Doc. 165), at 40. Claim splitting is generally prohibited by the doctrine of res judicata, which bars parties to a prior action or those in privity with them from raising in a subsequent proceeding any claim they could have raised in the prior action where all of the claims arise from the same set of operative facts. *See generally* Restatement (Second) of Judgments 2d § 24 (1982) (stating the general rule barring splitting claims). "[U]sual principles of both claim and issue preclusion apply in class actions," *Rector v. City and County of Denver*, 348 F.3d 935, 949 (10th Cir.2003), but "the court . . . cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action," Fed.R.Civ.P. 23 advisory committee's notes to the 1966 amendments.

Case law certainly exists to support the proposition that class certification should be denied on the basis that class representatives are inadequate when they opt to pursue certain claims on a class-wide basis while jeopardizing the class members' ability to subsequently pursue other claims. Defendants specifically rely on four cases in support of their argument. In *Clark v. Experian Information Solutions, Inc.*, Nos. 00–1217–24, 00–1218–24 & 00–1219–24, 2001 WL 1946329, at *1–*6 (D.S.C. Mar.19, 2001), the proposed named plaintiffs had disclaimed other, more substantial, claims of the class members in favor of a single cause of action for statutory and punitive damages under the Fair Credit Reporting Act, thereby potentially prejudicing class members who may have wanted to pursue other potential claims under the Fair Credit Reporting Act, claims for actual and compensatory damages, claims under state credit-reporting statutes, and state common

law claims. *Id.* at *4. The court determined the proposed named plaintiffs did not satisfy the adequacy of representation requirement because their interests were "not aligned with those of the class." *Id.* In *Thompson v. American Tobacco Co.,* 189 F.R.D. 544 (D.Minn.1999), the court determined the proposed named plaintiffs in a tobacco litigation case were inadequate class representatives because they alleged industry-wide fraud and sought only a smoking cessation and/or medical monitoring program while they potentially jeopardized class members' rights to bring personal injury and damage claims in a later lawsuit. *Id.* at 550. The court reasoned that "the possible prejudice to class members is simply too great for the Court to conclude that the named Plaintiffs' interests are aligned with those of the class." *Id.* at 551. In *Pearl v. Allied Corp.,* 102 F.R.D. 921 (E.D.Pa.1984), the court determined the proposed named plaintiffs were inadequate class representatives because they sought to recover the cost of removing the allegedly defective product, punitive damages, and a fund for testing, screening and treatment of future medical problems, while they abandoned their claims for present physical injury, diminution in property value, and breach of express warranty. *Id.* at 922–23. The court reasoned that the case was analogous to *Feinstein. Id.* at 924. In *Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595, 606–07 (S.D.N.Y.1982), the court determined the proposed named plaintiffs were not adequate representatives because they asserted only claims for breach of implied warranty and sought only economic damages, when claims for death, injury, accident-related property damage, or other consequential damage could have been pursued. *Id.* at 606. The court reasoned the plaintiffs' design of the case was essentially a cosmetic move that subjected putative class members to significant risks of being told later that they had impermissibly split a single cause of action. *Id.; see also, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Lit.,* 209 F.R.D. 323, 340 (S.D.N.Y.2002) (class representatives inadequate because they sought only injunctive relief while jeopardizing class members' personal injury claims); *W. States Wholesale, Inc. v. Synthetic Indus.,* 206 F.R.D. 271, 277 (C.D.Cal.2002) (class representative inadequate because it sought only injunctive relief and disgorgement of profits while abandoning damage claim; conflict among class members would also arise by virtue of the need to apportion disgorged profits).

Ultimately, the proposed class representatives' inadequacy in this line of cases was attributable to conflicts of interest between the proposed named plaintiffs and the class members. *Cf. Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. 2231 (adequacy of representation requirement serves to uncover conflicts of interest between class representatives and class members). As one court explained, those cases

> are all distinguishable from the case at bar, in that they involved actions where the class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes. The courts were justifiably cautious in observing the potential preclusive effect of such weak class actions.

*Coleman v. Gen. Motors Acceptance Corp.,* No. 39–0211, 220 F.R.D. 64, ——, 2004 WL 187332, at *18 (M.D.Tenn. Jan. 14, 2004).

In contrast, in this case the court is satisfied that the interests of the named plaintiffs are aligned with the interests of the absent class members. Although the named plaintiffs abandoned their common law fraud claim, they continue to pursue all of their other claims for compensatory damages, treble damages (a remedy akin to the punitive damage claim plaintiffs elected to forego when they abandoned their fraud claim), attorneys' fees and costs, and a judgment enjoining defendants from continuing their allegedly unlawful combination or conspiracy. This is not a case where the class representatives are pursuing relatively insignificant claims while jeopardizing the ability of class members to pursue far more substantial, meaningful claims. Rather, here the named plaintiffs simply decided to pursue certain claims while abandoning a fraud claim that probably was not certifiable. *See, e.g., Gunnells v. Healthplan Servcs., Inc.,* 348 F.3d 417, 434 (4th Cir.2003) (holding the district

court committed reversible error by certifying a class with respect to fraud claim); *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 211 (5th Cir. 2003) (observing that "[f]raud actions that require proof of individual reliance cannot be certified as Fed.R.Civ.P. 23(b)(3) class actions"; holding the district court committed reversible error by certifying a class in a RICO fraud action); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir.1998) (holding fraud claims do not provide a suitable basis for class-wide relief); *Baum v. Great W. Cities, Inc.*, 703 F.2d 1197, 1210 (10th Cir.1983) (affirming the district court's ruling denying class certification with respect to a fraud claim because individual issues would predominate). While the court can certainly appreciate the fact that a named plaintiff's failure to assert certain claims of the absent class members might give rise to a conflict of interest when the named plaintiff is advancing his or her own interests at the expense of the class, the mere fact that a named plaintiff elects not to pursue one particular claim does not necessarily create such a conflict. Here, the named plaintiffs' decision to abandon the fraud claim appears to have been a choice that advances the named plaintiffs' interests as well as the interests of the absent class members, and therefore the court is unpersuaded that any impermissible conflict of interest exists.

The court further wishes to observe that if defendants' argument were taken to its logical extreme, class action defendants could routinely defeat class certification by simply injecting the argument that a conflict of interest exists between the named plaintiffs and the absent class members because the named plaintiffs are not pursuing potential

fraud claims. This would, for example, as noted by plaintiffs at the class certification hearing, presumably eviscerate the possibility of certifying class actions under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (2002), or Rule 10(b)(5) promulgated thereunder, 17 C.F.R. § 240.10b–5, because the nucleus of facts giving rise to a 10(b)(5) securities fraud case also commonly give rise to a common law fraud claim.

In sum, the court is satisfied that the named plaintiffs' interests are aligned with those of the class members and that no conflicts of interest exist that would render the named plaintiffs inadequate class representatives. *See, e.g., In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1112 (10th Cir.2001) (finding no conflict of interest where defendant class representative's "interests were aligned with those of the other class members" in the sense that "all concerned wished to limit their liability to the lowest possible amount"); *see also, e.g., In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Lit.*, No. MDL 01–1396, 2003 WL 1589527, at *3–*4 (D.Minn. Mar.27, 2003) (rejecting inadequacy of representation argument in a multi-district litigation case dealing with surgically implanted prosthetic heart valves and finding the plaintiffs "all have the same incentive to pursue claims against" the defendant).[5]

### 2. Abdication of Role as Class Representative

■ Defendants also contend that many of the class representatives lack personal knowledge regarding their claims and have essentially abdicated their role as class representatives to their attorneys.

5. Plaintiffs also cite *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 107 Cal.Rptr.2d 761, 774–75 (2001), in support of their argument that class notice and opt-out provisions can protect class members' rights to pursue fraud claims on an individual basis if they wish to do so. There is contrary authority, however, stating that notice and opt-out procedures are insufficient to overcome conflicts of interest between the named plaintiffs and the class members. *See MTBE Lit.*, 209 F.R.D. at 338 n. 23 (rejecting the same argument raised by plaintiffs); *Clark*, 2001 WL 1946329, at *4 (D.S.C.2001) (same). The

court need not decide this issue because, for the reasons explained above, no impermissible conflict exists between the named plaintiffs and the absent class members in this case.

Nevertheless, with that being said, it would certainly be prudent to include language in the class notice advising potential class members that this lawsuit does not involve any fraud or FCA claims, and further that class members may risk being barred from pursuing any such potential claims in the future if they do not opt out of the class.

[T]he general standard is that the representatives must be of such a character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be protected.

... If the representative displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied. This inquiry into the knowledge of the representative is to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney; the named party must be an adequate representative in addition to having adequate counsel.

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1766, at 302–11 (2d ed. 1986 & Supp. 2003) (footnotes omitted). In making this inquiry, the court has considered the affidavits of the proposed named plaintiffs as a helpful starting point. The court's analysis, however, will focus on the deposition testimony of the proposed named plaintiffs, which the court finds more illuminating on this particular issue.

Mr. Gerdes is an AT & T residential customer in California who is also an attorney. His deposition testimony reflects that he understands the nature of the USF fund and the nature of the allegations in this lawsuit. *See* Gerdes Dep. at 22:16–23, 25:18–26:4, 54:13–17. He sought out information concerning AT & T's Universal Connectivity Charge [6] from an attorney. He conducted his own research regarding the USF fund through public records and public filings, and he has reviewed the research performed by his attorneys. He understands his responsibilities as a class representative and has already carried out many of those responsibilities. *See id.* at 50:1–12. Defendants do not contend (indeed, they could not credibly contend) that Mr. Gerdes is an inadequate class representative. The court finds that Mr. Gerdes is clearly an adequate representative for the conspiracy class and the AT & T subclass.

Gary Hellman is an attorney and a partner with Goldman & Hellman, an AT & T customer. Mr. Hellman admitted in his deposition that all information he possesses regarding AT & T's alleged overcharge has been provided by his attorney, and that he relied on counsel to obtain factual support for the allegation of collusion in the complaint. Mr. Hellman explained his understanding of the case, which is that the providers are using the fund as a profit center by charging their customers more than their contributions to the fund and keeping the difference, and that the providers had some type of agreement that they were all going to charge their customers more than the amount they contributed to the fund. He understands that his role as class representative primarily entails monitoring the litigation, keeping informed regarding the course of the litigation, assisting counsel with prosecuting the case, reviewing pleadings, responding to discovery, giving deposition testimony, and being consulted with respect to the course of the litigation. The court is satisfied that Goldman & Hellman will serve as an adequate representative for the conspiracy class and the AT & T subclass.

Sterling Beimfohr d/b/a Sterling Sails is also an AT & T customer. Most of his knowledge regarding the USF and related surcharge rates also came from his attorneys. He refused to state in his deposition, based on the attorney-client privilege, whether his attorney solicited his involvement in the litigation. He testified that he understands the case to be about the way the phone companies charge the Universal Connectivity fee in the sense that they are charging customers more than they are required to pay the government, and that the carriers conspired to fix the rates. He testified that he understands his role in this litigation to be "[t]o represent the class to the best of their interest." He expects to keep informed about the case and what is happening with the case. He has "read all the documents" the attorneys have sent him relating to this case. The court is also satisfied that Mr. Beimfohr is sufficiently interested in the case that Sterling Sails will serve as an adequate

---

6. AT & T refers to its USF surcharge as a Universal Connectivity Charge.

representative for the conspiracy class and the AT & T subclass.

Diane Markin–Venn is the owner and president of Lady Di's, an AT & T customer. Ms. Markin–Venn testified in her deposition that her knowledge regarding calculation of the USF charge also comes solely from her attorneys. She testified regarding her general understanding of the manner in which the USF fund is administered, *see* Markin–Venn Dep. at 26:18–27:21, and she believes the carriers have agreed to charge the same amount for the USF charge. She understands her role in this litigation is to represent the businesses and customers who have been overcharged, and she further indicated she is willing to testify at trial and take on any other role needed. The court is satisfied that Lady Di's will serve as an adequate representative for the conspiracy class and the AT & T subclass.

Miriam Kane is an accounts payable manager at Pressman Toys, a Sprint customer. She testified in her deposition that the only information she knows about the alleged conspiracy comes from her attorney,[7] which is how Pressman Toys became involved in this lawsuit. Ms. Kane testified that her understanding of the USF surcharge rate was that the carriers are supposed to collect "whatever the government told them was the cost," but "weren't supposed to jack up the rate." She testified that as a class representative Pressman Toys is supposed to "produce documents that are needed and stand up for the rights not only of our company but everyone else in the class action suit and protect their rights as best we can." She further testified that she got involved in the litigation "[b]ecause it bothered [her] and it bothered the company that we were misled or things were misrepresented." She stated: "[W]e try to cut costs and . . . to be overpaying for something that was unnecessary . . . it's . . . part of doing business where we try to catch things like that and not be duped." The court is satisfied that Pressman Toys will serve as an adequate representative for the conspiracy class and the Sprint subclass.

Ronald Johnson is the controller and Rule 30(b)(6) designee of B & C Values, a Sprint customer. He testified in his deposition that his attorneys initiated contact with him and his knowledge of the alleged overcharge came solely from the complaint and from allegedly privileged discussions with his attorneys. He testified that his understanding of the case is that the USF charge was understood to be a pass-through charge to the FCC and "that may not be the case" and that the companies "may be setting the USF rate." He has tried to keep up in terms of what is going on with the case by reading the complaint and other documents. He understands that B & C Values has a fiduciary duty to others in the same position and that B & C is representing others in the same position who are using Sprint as a long distance carrier. The court is persuaded that B & C Values will serve as an adequate representative for the conspiracy class and the Sprint subclass.

David Leib is the owner and president of NYLB, an MCI customer. His deposition testimony reflects that his involvement in this case arose from a routine telephone conversation with a childhood friend, who happened to be an attorney. His knowledge of MCI's allegedly inflated USF surcharge rates came from his attorney-friend, as did his involvement in this case. His knowledge of his claims came solely from his attorney and from reviewing the complaints. During Mr. Leib's deposition, he demonstrated adequate familiarity and interest in the case. He understands the nature of his claims against AT & T and Sprint, *i.e.*, "[f]or price fixing of the USF fee," and he is familiar with the allegations in the complaint. Perhaps most importantly, his deposition testimony reflects that he has been playing an active role as a named plaintiff. He understands that his duties as a class representative include hiring competent counsel, appearing at trial, monitoring and participating in the litigation, and participating in discovery. He communicates with counsel when

---

**7.** Defendants have pointed out that Ms. Kane's attorney, Michael Kane, is also her son. Defendants do not argue, however, that Pressman Toys is an inadequate class representative on this basis. The court finds this fact to be immaterial because Mr. Kane has not entered his appearance in this case nor is there any suggestion that he has taken any active role in this case.

new documents come about, he reviews faxes and e-mails, he stays "in the general loop of what's going on," and he talks "a good amount" with his attorney by phone and in person. Based on Mr. Leib's familiarity with the nature of the case and his demonstrated willingness to carry out the duties of a class representative, the court is satisfied that NYLB will serve as an adequate representative for the conspiracy class.

## II. Rule 23(b) Requirements

Now that the court has determined Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied, it must also find that the requirements of one of the subsections of Rule 23(b) are satisfied. In this case, plaintiffs ask the court to certify the classes under Rule 23(b)(2) and 23(b)(3). Defendants argue that the court should not certify a Rule 23(b)(3) class because individual rather than common issues will predominate the class, and also that the court should not certify a Rule 23(b)(2) class because the predominant form of relief sought by plaintiffs is money damages. For the reasons explained below, the court disagrees and finds that class certification under both Rule 23(b)(2) and Rule 23(b)(3) is appropriate.

### A. Certification Under Rule 23(b)(3)

To certify a class under Rule 23(b)(3), the court must find that: (1) common questions predominate over questions affecting only individual members; and (2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In this case, the court finds that both of these requirements are satisfied with respect to the conspiracy class and both subclasses.

#### 1. Predominance: Plaintiffs' Antitrust Claim

 In order for plaintiffs to prevail on their antitrust price-fixing conspiracy claim, they must prove: (1) that defendants violated the antitrust laws; (2) the fact of damage, which is also called impact; and (3) the amount of damages. *See Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 675–76 (5th Cir.1982) (liability under the Clayton Act requires showing a violation of the antitrust laws, the fact of damage, and some indication of the amount of damage); *In re Linerboard Antitrust Lit.*, 203 F.R.D. 197, 214 (E.D.Pa. 2001) (listing these three elements), *aff'd*, 305 F.3d 145 (3d Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003); *In re Playmobil Antitrust Lit.*, 35 F.Supp.2d 231, 240–41, 245 (E.D.N.Y.1998) (same); *see also Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir.1992) (plaintiff seeking treble damages under the Clayton Act must establish an antitrust violation and impact).

#### a. Violation of the Antitrust Laws

The issue of whether defendants violated the antitrust laws will be a common one among all of the class members. The central allegation in plaintiffs' complaint is that defendants and MCI engaged in a combination or conspiracy to raise, fix, or maintain at artificially high and non-competitive levels their USF surcharge rates. Thus, plaintiffs can present common proof on the issue of whether defendants violated the antitrust laws by engaging in this combination or conspiracy. This issue will necessarily focus on the conduct of defendants and MCI, not on the individual conduct of class members. *See, e.g., In re Flat Glass Antitrust Lit.*, 191 F.R.D. 472, 484 (W.D.Pa.1999) (proof of conspiracy is susceptible to generalized proof because the focus is on defendants' actions); *Playmobil Antitrust Lit.*, 35 F.Supp.2d at 245 (existence of conspiracy would be proven by evidence common to the class); *In re Catfish Antitrust Lit.*, 826 F.Supp. 1019, 1039 (N.D.Miss.1993) (proof of conspiracy would be "pertinent and common to all plaintiffs").

#### b. Impact

The parties' primary dispute regarding whether common issues will predominate plaintiffs' antitrust claim is whether the issue of impact is susceptible to class-wide proof. Under the impact requirement, a plaintiff must generally show that he or she paid supracompetitive prices as a result of the

antitrust conspiracy. *See State of Ala. v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 327 (5th Cir.1978). Some courts suggest there is a presumption of impact in price-fixing cases. *See, e.g., Linerboard Antitrust Lit.,* 305 F.3d at 153 (observing that a strong argument could be made that the district court properly applied the presumed impact theory in an antitrust price fixing case); *In re Aluminum Phosphide Antitrust Lit.,* 160 F.R.D. 609, 615 (D.Kan.1995) (citing case law to suggest that impact may be presumed in price-fixing cases); *Catfish Antitrust Lit.,* 826 F.Supp. at 1041 (observing that "[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price"; citing case law). On the other hand, some courts require an expert "to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be competitive" to establish antitrust impact. *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1055 (8th Cir.2000); *see also Linerboard Antitrust Lit.,* 305 F.3d at 153–55 (affirming the district court's decision to certify the class where the plaintiffs presented two expert affidavits explaining how impact could be assessed on a class-wide basis); *cf. Playmobil Antitrust Lit.,* 35 F.Supp.2d at 246 (observing the disparity among courts on this issue). Regardless of which standard applies, the court is satisfied that the impact requirement is satisfied here.

Plaintiffs submitted a declaration of an expert economist, Dr. John C. Beyer.[8] In that declaration, Dr. Beyer devotes approximately five pages of thoughtful discussion to analyzing the impact of the alleged conspiracy. He concludes that if defendants and MCI did engage in the price-fixing conspiracy that is alleged in this case, the impact of that conspiracy can be proven on a class-wide basis:

> 22. From all of the above findings and analyses, I have concluded that the alleged conspiracy would have had a common, class-wide impact in that all class members would have paid higher prices than they would have in the absence of the conspiracy. First, the degrees of product overlap and geographic overlap are so significant that all class members, in the absence of the conspiracy, would have benefited from more active price competition between at least two or more defendants. Second, the defendants' fungible, commodity-like products indicate that purchasers can switch among suppliers largely on the basis of price because there is little quality differentiation. This means that in the absence of a conspiracy, there would have been more intense price competition among the defendants across all products. Therefore, a conspiracy, which lessens competition, would impact prices across all products and hence all customers. Given the market power jointly held by the defendants, class members' ability to avoid impact from a conspiracy by shifting to another supplier would be limited.

Defendants argue the factual underpinnings of Dr. Beyer's reasoning is flawed because certain large business customers take service pursuant to individually negotiated contracts, *i.e.,* so-called "enterprise customers." The *only* evidence defendants cite in support of this argument are declarations from two employees. The declaration of AT & T employee Robert Dapkiewicz states, in relevant part:

> 3. In contrast to residential and small business customers, large business customers generally purchase AT & T telecommunications services pursuant to individually-negotiated and physically-executed written contracts that reflect the unique bundle or mix of services needed to satisfy their telecommunications requirements or, in the case of government customers, to comply with the purchasing regime under which they operate. The pricing and other terms and conditions in these contracts may reflect trade-offs between and among the different services included. For example, a retail business customer might accept a higher per minute switched access outbound long-distance price in order to obtain a lower price on inbound long-distance service, or a more fulsome set of warran-

---

8. "[Dr.] Beyer has been involved in roughly 20 class action price-fixing cases." *DeLoach v. Phil-* *ip Morris Cos.,* 206 F.R.D. 551, 563 (M.D.N.C. 2002).

ties. Conversely, a government carrier may be able to command a lower price for a given service because of a reduced risk of uncollectibles.

4. When the FCC implemented the Universal Service Fund ("USF") assessment program in 1998, AT & T had a number of pre-existing multi-year contracts that prohibited AT & T from collecting any additional charges from the customer. In light of these contractual provision[s], AT & T believed that it could not pass through to the affected customers any portion of the cost of its contribution to the USF through the collection of the UCC. Over time, virtually all of these contracts have been terminated or re-negotiated.

Similarly, the declaration of Sprint employee Chris D. Schneider states, in relevant part: "Many of Sprint's large business customers purchase services under individually negotiated contracts, that have customized business terms and conditions. These individually negotiated contracts can and do provide for varying bundles of services and specialized pricing and billing as individually negotiated."

The court is unpersuaded that these general statements regarding enterprise customers' individually negotiated contracts do in fact successfully challenge the factual underpinnings of Dr. Beyer's declaration. The class definitions only include customers who paid USF surcharges during the relevant time period. The declarations of Mssrs. Dapkiewicz and Schneider notably do not state that any enterprise customer negotiated a lower USF surcharge rate. Thus, the record currently before the court suggests that any enterprise customers who are class members paid the standard USF surcharge rates for businesses. Therefore, all class members, even enterprise customers, were presumably impacted by the alleged price-fixing conspiracy.

Even if the court accepts, however, that product pricing variations exist for enterprise customers because those customers have individually negotiated contracts, the court is nevertheless still unpersuaded that the mere general statements of Mssrs. Dapkiewicz

and Schneider, without further meaningful elaboration or evidentiary support regarding the significance of this fact, are sufficient to defeat class certification. Courts have recognized that the mere fact that defendants entered into price negotiations with their customers using the conspiratorially set price as a factor in the negotiations provides adequate proof of impact. As one oft-quoted court has explained:

> In a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began. The theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.

*In re Industrial Diamonds Antitrust Lit.,* 167 F.R.D. 374, 383 (S.D.N.Y.1996) (citations and footnote omitted; collecting case law on this issue); *accord Linerboard Antitrust Lit.,* 203 F.R.D. at 221 (quoting *Industrial Diamonds*); *In re Plastic Cutlery Antitrust Lit.,* No. 96–CV–728, 1998 WL 135703, at *7 (E.D.Pa. Mar.20, 1998) (same; holding adequate proof of impact would exist if information on an allegedly conspiratorially set uniform price list was a factor in negotiating purchases); *see also, e.g., In re Corrugated Container Antitrust Lit.,* 80 F.R.D. 244, 250–52 (S.D.Tex.1978) (quoting an expert affidavit explaining that such price variations "are not inconsistent with ... an artificially inflated general price level [because] the artificially inflated general price level is the point from which all such price variations start").

Further, plaintiffs submitted a supplemental declaration from Dr. Beyer stating that nothing submitted in defendants' brief in opposition to class certification and related materials (*e.g.,* Mssrs. Dapkiewicz and Schneid-

er's declarations) caused him to change his prior opinions. His original declaration acknowledged that there is a distinction between the "mass market" (residential and small business customers) and the "larger business market" (medium-sized and large business customers), but nevertheless explained that "[e]ach of the defendants offers all of these services, so that service overlap is substantial. In addition, these services are commodity-like in that there is a high degree of product fungibility across the defendants." Dr. Beyer's conclusion that impact can be proven on a class-wide basis rests on the significant degree of product overlap and the fungible nature of defendants' products, both of which Dr. Beyer explained are considerations that apply equally to the larger business market and the mass market. From this, he concluded that "*all* class members would have paid higher prices than they would have in the absence of a conspiracy" (emphasis added) because all class members would have benefitted from more active price competition among the defendants in the absence of a conspiracy. For purposes of demonstrating class-wide impact, then, the fact that the enterprise customers may have had separately negotiated contracts does not mean that they were not impacted by the conspiracy. Instead, it suggests they may have been impacted to a greater or lesser degree than other customers, and this is simply not a consideration in determining whether those customers were impacted by the alleged conspiracy. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (noting the "burden of proving the fact of damage ... is satisfied by ... proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage" (emphasis added)).

In sum, Dr. Beyer's declaration provides a reasonable basis and a feasible means for plaintiffs to prove impact on a class-wide basis. At the class certification stage, the court's task is not to determine whether his opinion will ultimately be persuasive, but rather to evaluate whether his declaration is sufficient to demonstrate common questions of fact warranting class certification. *See In re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d 124, 135 (2d Cir.2001). The court is satisfied that his declaration satisfies this criteria. *See, e.g., Linerboard Antitrust Lit.*, 203 F.R.D. at 220 (holding plaintiffs demonstrated a means of proving impact on a class-wide basis despite defendants' arguments regarding variations in products and pricing); *In re Vitamins Antitrust Lit.*, 209 F.R.D. 251, 266 (D.D.C.2002) (same); *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 561–64 (M.D.N.C.2002) (same); *Corrugated Container Antitrust Lit.*, 80 F.R.D. at 249–52 (same).[9]

### c. Proof of Damages

The court is also satisfied that plaintiffs have suggested a potentially feasible method for proving damages on a class-wide basis. Although Dr. Beyer states that the competitive benchmark method cannot be used to assess class-wide damages because the allegations suggest defendants were pricing collusively before the class period began, he nevertheless states that damages can be proven by using a yardstick measure or estimating a reasonable range of supply and demand elasticities. He states that if these methods prove problematic a minimum measure of damages can be estimated by determining the USF surcharges actually collected by defendants and deducting the dollar amount they actually remitted to the FCC. Even if damages had to be determined on an individualized basis, however, that would not preclude class certification. *See, e.g., In re Aluminum Phosphide Antitrust Lit.*, 160 F.R.D. 609, 615 (D.Kan.1995) ("[T]he fact that individual proof as to the amount of damages may be necessary does not preclude class certification."); *In re Catfish Antitrust Lit.*, 826 F.Supp. 1019, 1043–44 (N.D.Miss. 1993) (observing that individual questions of

---

**9.** For this same reason, the court rejects defendants' argument that the court should modify plaintiffs' proposed class definitions to exclude enterprise customers. Quite simply, plaintiffs have satisfied their burden on this issue at this stage of the proceedings. Whether plaintiffs can actually prove antitrust impact with respect to these enterprise customers is an issue to be decided on the merits.

damages should not preclude class certification in price-fixing antitrust cases).

### d. Other Cases Cited by Defendants

Defendants also argue that the broad spectrum of customers, services, and markets at issue render this case unsuitable for class treatment of plaintiffs' antitrust claims. Defendants point out that the class and subclasses include the smallest residential customers, the largest corporate entities, and everything in between. Defendants argue the USF charges were different for residential and business customers throughout the conspiracy period, and that those charges are set by separate organizations within each carriers. Further, residential customers generally purchase switched access long-distance service whereas business customers purchase customer-specific bundles of different telecommunications services. Also, service for residential customers is generally governed by standard form contracts whereas large businesses are often able to negotiate their contracts. Even the FCC regards the long distance business as being comprised of two markets, one consisting of residential and small business customers and the other consisting of medium-sized and large business customers.

In support of defendants' arguments in this regard, they predominantly rely on three cases, the first of which is *Burkhalter Travel Agency v. MacFarms International, Inc.,* 141 F.R.D. 144 (N.D.Cal.1991). *Burkhalter* involved a claim that macadamia nut producers conspired to fix prices in violation of the federal antitrust laws. *Id.* at 145. The proposed class of plaintiffs included "buyers of both retail and bulk macadamia nuts, buyers on both Hawaii and the mainland, and buyers of each variety of macadamia nut product (salted nuts, chocolate covered nuts, toasted nuts, macadamia nut brittle, macadamia nut oil, etc.)." *Id.* at 151. The court found that, although the proposed class shared a common issue regarding the defendants' alleged price fixing, the requirement that common issues must predominate was not satisfied because of the many "cross-cutting factual circumstances among the class members." *Id.* at 152. The court explained that

there are significant differences between the market for macadamia nuts on Hawaii and on the mainland, between large and small purchasers, and between bulk and retail purchasers. In these different markets, defendants price nuts in different ways and purchasers have varying degrees of leverage over defendants. As this action is about price-fixing activities conducted by defendants, grouping purchasers in all of these sub-markets together ignores the crucial differences in how defendants set prices for different purchasers. Given the diversity of markets, it can hardly be said that common issues predominate.

*Id.* at 154 (citations omitted). The proposed class was so ill-defined that one of the defendants was also a member of the proposed plaintiff class. *Id.* at 155.

The second case predominantly relied on by defendants is *Kenett Corp. v. Massachusetts Furniture & Piano Movers Ass'n,* 101 F.R.D. 313 (D.Mass.1984). *Kenett* involved a claim against moving companies that they conspired to fix the prices of moving household goods and office equipment in Massachusetts. *Id.* at 314. The court held that common issues among the class would not predominate questions affecting only individual members. *Id.* at 315. The court explained that the case was not like those "involving a uniform supracompetitive price for a fungible product" because the claim at issue "involves a bundle of moving services that differs from mover to mover and from customer to customer." *Id.* at 316. A number of variables affected the total price paid by the consumer such as hourly rate for the move, the time and resource efficiency of a move, bargaining with cost-conscious customers in order to win their business. *Id.* The court explained that

because the exact mix of services purchased by each customer is unique, individual inquiry would be necessary to determine how much that particular defendant would have charged for the move absent the alleged conspiracy, in light of the costs facing the company at the time, its competitive market, its reputation, and the particular services required for the move.

*Id.*

The courts' reasoning in *Burkhalter* and *Kenett* were focused on the allegedly conspi-

ratorially overpriced product, *i.e.*, macadamia nuts in *Burkhalter* and moving charges in *Kenett*. Here, defendants' argument focuses on their long-distance products in general. The allegedly conspiratorially overpriced product in this case, however, is much more narrow: the USF surcharge. That surcharge is a fungible, homogenous product embodied in a flat percentage charge that is readily susceptible of being segregated from any non-homogenous aspects of defendants' products. In other words, defendants' arguments regarding the variations in their products, pricing, services, and markets focus on the sale of defendants' products as a whole, whereas the USF surcharge is the actual product at issue here. The court recognizes there may be some discrepancies in this surcharge rate among carriers and between business and residential customers. Plaintiffs, however, allege that defendants engaged in a combination or conspiracy to raise, fix, or maintain at artificially high and non-competitive levels *all* of their USF surcharge levels, and therefore any deviations among those rates go to the issue of individual damage calculations, not to the issue of liability. While the court can certainly appreciate the fact that common issues do not predominate every horizontal price-fixing antitrust claim, as illustrated in the cases cited by defendants, common issues do in fact predominate the horizontal price-fixing claim at issue in this case.

The third case predominantly relied on by defendants is *Sample v. Monsanto Co.*, 218 F.R.D. 644 (E.D.Mo.2003). *Sample* involved an alleged conspiracy to fix prices of genetically modified corn and soybean seed. *Id.* at 646. The court explained that the expert testimony offered by plaintiffs was too con-

clusory for the court to rely on to certify the class. *Id.* at 650. The court relied on "evidence submitted during the class certification hearing" that revealed: the genetically modified seeds are not homogenous products; the market for seeds is highly individualized depending upon geographic location, growing conditions, consumer preference, and other factors; plaintiffs alleged that only the "premium" portion of the seed product was the subject of the alleged price-fixing scheme, and that premium portion could not be segregated from the rest of the seed; and the seeds were not offered for sale at a uniform price. *Id.* at 650–51. The court concluded that the plaintiffs could not establish the " 'but-for' marketplace necessary to establish antitrust impact without a reliable methodology to determine the premiums paid by farmers." *Id.* at 651.

In this case, unlike in *Sample*, defendants have offered no evidence to demonstrate the USF surcharge is not a homogenous product, that the USF surcharge market is highly individualized, that the USF surcharge cannot be segregated from the rest of defendants' products, or that the USF surcharge varied among customers (other than as between carriers and as between business versus residential customers, subcategories that are easily defined). Rather, as explained previously, here the allegedly conspiratorially overpriced product is a fungible, homogenous product embodied in a flat percentage charge that is readily susceptible of being segregated from any non-homogenous aspects of defendants' products. Thus, the court also finds *Sample* unpersuasive.[10]

In sum, despite defendants' admirable attempts to suggest that individual issues will

---

**10.** The court also finds two other cases cited by defendants to be unpersuasive. Defendants point out that in *In re Microsoft Corp. Antitrust Lit.*, 214 F.R.D. 371 (D.Md.2003), the court found that the claims of individual consumer class representatives were atypical of the claims of large-volume enterprise customers who purchased software products through an entirely different distribution line. *Id.* at 378. *Microsoft*, however, was not a horizontal price-fixing case like this one. Rather, it was a monopoly case under Section 2 of the Sherman Act involving the issue of whether the defendant monopolized a defined antitrust product market.

Defendants also point out that in *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523 (E.D.Tex.2003), the court found that it would be impossible to present class-wide evidence of the price each plaintiff would have paid but for the conspiracy "[b]ecause of the many individualized factors that established what each Plaintiff actually paid." *Id.* at 531. Again, the court finds *Piggly Wiggly* to be distinguishable for largely the same reasons that *Burkhalter* and *Kenett* are distinguishable. In addition, in *Piggly Wiggly*, the plaintiffs produced no evidence, by expert testimony or otherwise, to suggest that impact could be proven on a class-wide basis.

abound, the court is unpersuaded. This case involves horizontal price-fixing allegations and common issues will clearly predominate. *See, e.g., Vitamins Antitrust Lit.,* 209 F.R.D. at 262–70 (rejecting arguments similar to those raised by defendants in this case and concluding the predominance requirement was satisfied in a horizontal price-fixing case involving purchasers of vitamins); *Linerboard Antitrust Lit.,* 203 F.R.D. at 214–23 (same in case involving purchasers of corrugated paper made using linerboard); *In re Flat Glass Antitrust Lit.,* 191 F.R.D. 472, 484–88 (W.D.Pa.1999) (same in case involving purchasers of flat glass products); *cf. Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (observing that "predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws").

### 2. Predominance: Plaintiffs' Breach of Contract Claim

■■■ The court is also satisfied that common issues will predominate plaintiffs' breach of contract claims. Plaintiffs' second amended complaint alleges that defendants breached certain provisions of their standard form contracts. Defendants argue that "some members of the AT & T and Sprint subclasses, namely large corporate customers, purchased telecommunications services pursuant to individually-negotiated contracts, some of which contained different provisions potentially impacting the collection of USF charges." The record is notably devoid, however, of any evidence of these "different provisions." Thus, based on the allegations in plaintiffs' complaint, the court is satisfied that the common issue of liability for breach of contract will predominate plaintiffs' breach of contract claim. *See, e.g., In re Tri–State Crematory Lit.,* 215 F.R.D. 660, 692 (N.D.Ga. 2003) (finding predominance requirement satisfied with respect to breach of contract claim); *Winkler v. DTE, Inc.,* 205 F.R.D. 235, 243 (D.Ariz.2001) (rejecting argument that individual issues would predominate breach of contract claim where standard form contracts were at issue); *Heartland Communications, Inc. v. Sprint Corp.,* 161 F.R.D. 111, 117–18 (D.Kan.1995) (finding individual issues would predominate breach of contract claim). This is especially true in light of the fact that the proof will overlap somewhat on plaintiffs' antitrust conspiracy claim and their breach of contract claim. *See, e.g., George Lussier Enters. v. Subaru of New England, Inc.,* No. 99–109–B, 2001 WL 920060, at *19–*20 (D.N.H. Aug.3, 2001) (holding the predominance requirement for breach of contract claim was met in part because a certifiable antitrust claim involved the same facts).

### 3. Superiority

■■■ The requirement that a class action be the superior method of resolving the claims insures that there is no other available method of handling the litigation which has greater practical advantages. Fed.R.Civ.P. 23 advisory committee notes to the 1966 amendments. Here, the obvious alternative to a class action would be for plaintiffs to bring individual suits against defendants. This would be grossly·inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The millions of class members are dispersed across the country, each with relatively similar claims. It can reasonably be anticipated that many of the individual claims will involve relatively insubstantial amounts of money such that a class action is perhaps the only feasible way for plaintiffs to pursue those claims. Thus, the court is persuaded that a class action is by far the most superior method for resolving the claims at issue in this lawsuit.

### 4. Certification of the Conspiracy Class Under Rule 23(b)(2)

■■■ As a preliminary matter, the court wishes to observe that given the court's ruling certifying the conspiracy class under Rule 23(b)(3), there is some authority to suggest that the court need not decide the issue of whether the conspiracy class may also be certified under Rule 23(b)(2). Rule 23(b) is written in the disjunctive—that is, it provides that a class action may be certified if the four prerequisites of Rule 23(a) are satisfied and in addition the requirements of subsection (1) "or" (2) "or" (3) are satisfied, and therefore a class action can be maintained under any one

of these three subsections. *See In re Visa Check/MasterMoney Antitrust Lit.*, 280 F.3d 124, 147 (2d Cir.2001) (holding the court was not required to decide the issue of whether the district court properly certified a Rule 23(b)(2) class because the court "already concluded that the district court appropriately certified the class under Rule 23(b)(3)"; citing authority for the proposition that a court need only find that a class action may be maintained under any of the three subdivisions), *cert. denied*, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *see, e.g., Daniel v. Am. Bd. of Emergency Med.*, 269 F.Supp.2d 159, 203–04 (W.D.N.Y.2003) (observing that in the Second Circuit once the district court has found an action to be maintainable under any single category of Rule 23(b), the court need not evaluate whether certification under another category is also appropriate); *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 226 (E.D.Mich.2002) (citing *Visa Check/MasterMoney Antitrust Lit.* and applying this same rule of law), *appeal denied*, 310 F.3d 953 (6th Cir.), *cert. denied*, —— U.S. ——, 123 S.Ct. 2252, 156 L.Ed.2d 112 (2003).

Plaintiffs nevertheless urge the court to also certify the conspiracy class under Rule 23(b)(2) because, plaintiffs contend, it is the appropriate procedural vehicle for them to obtain the injunctive relief that they seek. The court is not necessarily persuaded this is true. *See, e.g., Northwest Airlines*, 208 F.R.D. at 226 (noting the plaintiffs' proposed damage class could "serve as appropriate vehicles for the award of both monetary and injunctive relief"). The Tenth Circuit, however, has not spoken on the precise issues of the propriety or necessity of certifying the injunctive relief aspect of a class under Rule 23(b)(2) and the damages aspect of the class under Rule 23(b)(3). The court will, therefore, out of an abundance of caution, evaluate whether the conspiracy class is also certifiable under Rule 23(b)(2).

Rule 23(b)(2) allows certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The court may decline to certify a class under Rule 23(b)(2) if the predominant form of relief sought is money damages. *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir.1995) (finding no abuse of discretion where trial court declined to certify class under Rule 23(b)(2) because the relief sought was predominantly money damages); *see, e.g., Zapata v. IBP, Inc.*, 167 F.R.D. 147, 161–62 (D.Kan.1996) (declining to certify class under Rule 23(b)(2) where plaintiffs primarily sought money damages); *Heartland Communications*, 161 F.R.D. at 117 (same); Fed. R.Civ.P. 23 advisory committee notes to the 1966 amendments (stating that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

In this case, the monetary damages aspect of the conspiracy claim is certainly significant, but the injunctive relief aspect is also potentially significant. Plaintiffs seek to enjoin defendants from continuing to engage in the allegedly unlawful price-fixing conspiracy. Defendants suggest this injunctive relief is obsolete given the FCC's ruling dictating long distance carriers' USF-fund recovery practices effective April 1, 2003, which generally prohibits long distance carriers from imposing USF surcharge rates that exceed the FCC's USF contribution factor. The declaration submitted by Dr. Beyer, however, suggests that a USF surcharge equal to the USF contribution factor may still be a result of collusion. His declaration states:

> [T]raditional economic analysis indicates that only in the case of a market with perfectly inelastic demand or perfectly elastic supply would one expect suppliers to pass on to customers the full amount of increased costs such as the USF contributions. In no instance would one expect suppliers to pass on more than the cost. In the case of long-distance telephone service, demand is not perfectly inelastic and supply is not perfectly elastic. As a result, absent the alleged cartel, only a portion of USF costs would have been passed on to customers by the defendants.

In other words, defendants' USF-fund recovery practices may continue to violate the

prohibition on horizontal price fixing because the FCC's ruling only prescribes a ceiling for USF surcharges.[11] In a truly competitive market, defendants' USF surcharge rates should arguably be lower than the FCC's USF contribution factor. If defendants continue to charge allegedly inflated and anticompetitive USF surcharge rates, the value of those overcharges during the next decade would likely exceed the value of the plaintiffs' current damage claims. Thus, any injunctive relief that might ultimately be awarded could prove to be highly significant. *See, e.g., In re Visa Check/Mastermoney Antitrust Lit.,* 192 F.R.D. 68, 88–89 (E.D.N.Y.2000) (certifying a class action under Rule 23(b)(3) and Rule 23(b)(2) because the plaintiffs sought "highly significant injunctive relief"), *aff'd,* 280 F.3d 124 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002). Class certification is not the appropriate stage to decide the merits of this argument. If, however, plaintiffs are able to prove at trial that they are entitled to the sought-after injunctive relief, the court is unpersuaded that monetary relief would be the predominant form of relief.

This court's decision in *Heartland Communications, Inc. v. Sprint Corp.,* 161 F.R.D. 111 (D.Kan.1995), does not dictate a different result. In *Heartland,* the court declined to certify a Rule 23(b)(2) class in addition to a Rule 23(b)(3) class. *Id.* at 117. The court explained that it was "clear from the stated causes of action contained in plaintiffs' complaint that the predominant relief requested is monetary damages for Sprints' [sic] alleged breach of contractual obligations." *Id.* By comparison, in this case, as explained above, the court is unpersuaded that monetary damages are necessarily the predominant form of relief sought.

The court is mindful of the Tenth Circuit's mandate that "if there is error to be made, let it be in favor and not against the maintenance of a class action." *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968). Accordingly, the court will certify the injunctive relief

aspect of the conspiracy class under Rule 23(b)(2). The court will, however, exercise its discretionary authority pursuant to Rule 23(d)(2) and 23(d)(5) and provide the conspiracy class members with notice and opt-out rights equally insofar as that class is certified under Rule 23(b)(2) and Rule 23(b)(3). *See In re Monumental Life Ins. Co.,* 343 F.3d 331, 340 (5th Cir.2003) (district court may exercise its discretionary authority under Rule 23(d)(2) to provide notice and opt-out rights to a Rule 23(b)(2) class); *Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir.2003) (same); *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 166–67 (2d Cir. 2001) (same; also citing the district court's discretionary authority under Rule 23(d)(5)), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002); *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139,* 216 F.3d 577, 582 (7th Cir.2000) (same). This will hopefully advance the interests of fairness and litigation efficiency by ensuring that conspiracy class members are treated similarly with respect to both the damage and injunctive relief aspects of their antitrust claims.

### III. Modification of the Class Definition to Exclude MCI Small Business Customers

Defendants have asked the court to revise the conspiracy class so that it does not include any MCI customers because NYLB, the lone non-residential MCI customer plaintiff, is subject to an arbitration clause that is identical to MCI's arbitration clause with its residential customers pursuant to which the court compelled arbitration of the residential customers' claims. *See In re Universal Serv. Fund Tel. Billing Practices Lit.,* No. 02–1468, 2003 WL 23219878, at *24–*27 (D.Kan. Dec.1, 2003). Defendants argue the court should compel arbitration of NYLB's claims for the reasons stated in the court's December 1 order, and that "[g]iven the absence of any MCI plaintiff that can pursue its claims in this Court, no class can properly be certified that includes MCI residential or busi-

---

**11.** For this same reason, the court rejects defendants' suggestion that the definition of the conspiracy class should be modified temporally so that it runs commensurate with the subclass definitions. Defendants' argument that they are no

longer violating the antitrust laws because their USF-fund recovery practices comply with the FCC's ruling is an issue that goes to the merits of plaintiffs' antitrust claim and the court will leave it for another day.

ness customers." Plaintiffs argue defendants have waived any right they may have had to compel arbitration of the MCI business customers' claims. For the reasons explained below, the court agrees. Further, the court would not be inclined to compel arbitration of the MCI business customers' claims in any event.

### A. Waiver

■■■ The right to arbitration, like any other contractual right, can be waived. *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1489 (10th Cir.1994). In determining whether the right to arbitration has been waived, the court must examine the following factors:

(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* (quoting *Peterson v. Shearson/Am. Express,* 849 F.2d 464, 467–68 (10th Cir.1988)); *accord McWilliams v. Logicon, Inc.,* 143 F.3d 573, 576 (10th Cir.1998). Whether a waiver has occurred depends upon the facts of the particular case. *Reid Burton Constr., Inc. v. Carpenters Dist. Council,* 614 F.2d 698, 702 (10th Cir.1980).

■■■ Defendants filed their motions to compel arbitration in this case almost sixteen months ago on October 16, 2002. Those motions did not ask the court to compel arbitration of *any* of the MCI customers' claims. In plaintiffs' memoranda in response to defendants' motions, plaintiffs pointed out that defendants did not ask the court to

compel arbitration of the MCI customers' claims. The first time defendants urged the court to compel arbitration of the MCI customers' claims was in their reply briefs. In AT & T's reply brief, AT & T quoted the arbitration provision in the "MCI General Service Agreement for Residential Customers." Notably, neither defendant submitted an MCI service contract as an exhibit in support of their argument that the court should compel arbitration of the MCI customers' claims. The *only* MCI service contract that was a part of the record on this issue was the residential customer service contract, and it was submitted as an exhibit to plaintiffs' response memoranda.

The court held a hearing on defendants' motions to compel arbitration more than a year ago on February 5, 2003. At that hearing, the issue of compelling arbitration of the MCI customers' claims was sufficiently discussed such that, despite the fact that defendants first raised this argument in their reply brief, the court considered the issue to have been sufficiently explored that it was a component of defendants' motion to compel arbitration.

On February 20, 2003, plaintiffs filed a motion for leave to file second consolidated and amended class action complaint that, among other things, sought to join Kathy Snavely and Carol Zinsmeister, both MCI residential customers, and NYLB as plaintiffs. On March 10, 2003, plaintiffs' second consolidated and amended class action complaint was filed pursuant to court order, thus joining NYLB as a plaintiff in this case.

On May 27, 2003, the court entered a memorandum and order resolving one of the issues raised by plaintiffs in opposition to defendants' motion to compel arbitration. *See generally In re Universal Serv. Fund Tel. Billing Practices Lit.,* No. 02–1468, 2003 WL 21254765, at *1–*6 (D.Kan. May 27, 2003). In that memorandum and order, the court advised the parties that it would take the remainder of defendants' motion to compel arbitration under advisement until the United States Supreme Court decided whether it would grant AT & T's petition for certiorari in *AT & T Corp. v. Ting,* No. 02–1521. On October 6, 2003, the Supreme

Court denied AT & T's petition for certiorari. *See AT & T Corp. v. Ting,* —— U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003). On December 1, 2003, the court entered a memorandum and order devoting approximately fifty pages to ruling on defendants' motion to compel arbitration. *See In re Universal Serv. Fund Tel. Billing Practices Lit.,* No. 02–1468, 300 F.Supp.2d 1107, —— – ——, 2003 WL 23219878, at *1–*27 (D.Kan. Dec.1, 2003). After that comprehensive memorandum and order was issued, defendants raised the issue of compelling arbitration of NYLB's claims for the first time during a status conference on December 17, 2003.

The court is of the opinion that, on balance, the factors listed above weigh in favor of finding that defendants waived any right they may have had to compel arbitration of NYLB's claims. Defendants' delay in raising this issue is inconsistent with the right to arbitrate. Defendants should have asserted any arguable right they had to compel arbitration of NYLB's claims within a reasonably prompt period after NYLB joined in this case as a plaintiff. Further, defendants' delay in raising this issue was substantial. They raised this issue more than nine months after NYLB joined in this case. There was a six-month interlude on the arbitration matter while the Supreme Court decided whether to grant certiorari in *Ting.* If defendants had truly wanted to compel arbitration of NYLB's claims, that issue could have been fully briefed by the parties during that interim time period.

Perhaps more importantly, though, the "litigation machinery ha[d] been substantially invoked" and substantial intervening steps had taken place by the time defendants raised this argument. By December 17, 2003, the court and the parties had already devoted an inordinate amount of resources to resolving substantial and meaningful threshold legal issues—in particular, the extent to which the named plaintiffs' claims were arbitrable—that defined the contours of this lawsuit. Defendants now raise this issue as an afterthought on a point they should have raised months ago. The court is not inclined to belatedly rehash the entire arbitration issue when defendants should have raised it in a manner that was apparent to the court long ago. Accordingly, the court holds that defendants have waived any right they may have had to arbitrate the MCI business customers' claims.

**B. Arbitrability of the MCI Business Customers' Claims**

The court also rejects defendants' argument on the merits because the court is unpersuaded that defendants are entitled to compel arbitration of the MCI business customers' claims on the same basis that they compelled arbitration of the MCI residential customers' claims. In the court's December 1, 2003, memorandum and order, it compelled arbitration of the MCI residential customers' claims on an equitable estoppel "intertwined claims" theory. *See id.* at *24–*27. The court's ruling rested on the principle of equitable estoppel, a principle with respect to which the district court may exercise its discretion. *Spaulding v. United Transp. Union,* 279 F.3d 901, 911 (10th Cir.) (trial court's refusal to apply equitable estoppel is reviewed for abuse of discretion), *cert. denied,* 537 U.S. 816, 123 S.Ct. 84, 154 L.Ed.2d 20 (2002); *see, e.g., Grigson v. Creative Artists Agency L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) (district court's decision whether to utilize equitable estoppel principles to compel arbitration is reviewed for abuse of discretion). The court concluded that "notions of equity and fairness require the court to compel arbitration of plaintiffs' antitrust claims against the long distance carriers other than their own under the terms of those plaintiffs' arbitration clauses with their respective long distance carriers." *Universal Serv. Fund,* 2003 WL 23219878, at *26 (quotation and citations omitted).

Here, the court is unpersuaded that notions of equity and fairness require the court to compel arbitration of NYLB's antitrust claim against AT & T and Sprint. The court could arguably compel arbitration of that claim as it did with respect to the MCI residential customers' antitrust claim on the basis that NYLB's antitrust claim is intertwined with its MCI service contract, which is the means by which MCI implemented the alleged conspiracy that was the product of

allegedly substantially interdependent and concerted misconduct among defendants and MCI. Ultimately, though, compelling arbitration pursuant to NYLB's arbitration clause presents different considerations than were at issue with respect to arbitration of the MCI residential customers' claims. All of the Sprint, AT & T, and MCI residential customers had arbitration provisions in their respective service contracts. By comparison, here Sprint and AT & T have no parallel arbitration provisions in their service contracts with any of their business customers. The only business customer plaintiffs with arbitration clauses in their service contracts are the MCI small business customers. Thus, the court's rationale in its prior opinion that the meaningfulness of the Sprint and AT & T arbitration clauses would be undercut if the court did not compel arbitration of all of the residential customers' claims does not apply with respect to the business customers' claims. AT & T and Sprint are not entitled to compel arbitration of their own business customers' claims. Therefore, requiring them to litigate NYLB's claims in court rather than in arbitration does not seem unfair because they never bargained for an arbitration clause with their own customers.

### IV. Appointment of Counsel

Rule 23 was amended effective December 1, 2003, to require an order certifying a class action to also appoint class counsel that will adequately represent the interests of the class. Fed.R.Civ.P. 23(c)(1)(B), (g)(1); *see also* Order Amending Federal Rules of Civil Procedure, 123 S.Ct. 496, U.S. Order 03–20 (2003) (providing the 2003 amendments apply to pending cases "insofar as just and practicable"). The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed.R.Civ.P. 23(g)(1)(C). For the reasons stated on the record at the initial conference in this case on August 15, 2002, the court is satisfied that the firms of Susman Godfrey L.L.P., Heins, Mills & Olson,

P.L.C. and Stanley, Mandel & Iola, L.L.P. satisfy these four criteria and will adequately represent the interests of the class as lead counsel. Diel & Seelman, PC, shall continue to serve as liaison counsel.

### V. Notice

Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The court believes that the overwhelming majority of, if not all, class members can likely be identified through reasonable efforts. To that end, defendants are directed to provide to plaintiffs the names, addresses, and telephone numbers of all customers who are potential members of the class on or before **March 12, 2004**. Also on or before **March 12, 2004**, plaintiffs shall prepare and submit to the court for approval an order regarding notice that complies with the requirements of Fed.R.Civ.P. 23(c).

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiffs' motion for class certification (Doc. 102) is granted. Accordingly, the court hereby certifies the conspiracy class, the AT & T subclass, and the Sprint subclass under the definitions set forth above as proposed by plaintiffs. The court appoints Susman Godfrey L.L.P., Heins, Mills & Olson, P.L.C., and Stanley, Mandel & Iola, L.L.P. as class counsel. The parties shall begin the process of giving notice to the class members as described above.